Commonwealth of Pennsylvania, Petitioner, *v.* Derry Township, Westmoreland County; Latrobe Borough, Westmoreland County; Latrobe Municipal Authority, Westmoreland County; Unity Township, Westmoreland County; and Youngstown Borough, Westmoreland County, Respondents.

620

Argued September 5, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Robert J. Shostak,* Special Assistant Attorney General, for petitioner.

*Charles H. Loughran,* with him *Loughran & Loughran,* for respondents.

OPINION BY JUDGE KRAMER, November 21, 1973:

This matter comes within the original jurisdiction of this Court. The action was commenced on January 10, 1972 by the filing of a petition to adjudge respondents in contempt by the Commonwealth of Pennsylvania against the respondents as indicated in the caption of this case. The proceedings have been protracted and complex and involve the attempt by the Department of Environmental Resources (DER) of the Commonwealth to carry out the legislative policies declared in The Clean Streams Law, Act of June 22, 1937, P. L. 1987, as amended, 35 P.S. §691.1 et seq. (hereinafter referred to as Clean Streams Law) to abate a public nuisance created by the lack of adequate sewage treatment facilities which is causing pollution in the watershed of the Loyalhanna Creek located in or about the four municipalities named in the petition. A preliminary Order was issued by the hearing Judge of this Court on July 31, 1972, in which Derry Township (Derry) was found to be in contempt in accordance with The Clean Streams Law (35 P.S. §691.210), and in which Derry was ordered to enter into immediate diligent negotiations with the Latrobe Municipal Authority (Latrobe Authority) until August 10, 1972, after which failing to reach an agreement with Latrobe Authority, negotiations were further ordered before a Master appointed by this Court. In paragraph No. 7 of said Order, it was set forth that: "7. If no agreement is reached and executed within the said seven additional days, the Master will immediately file a report containing his recommendations with the Court by August 21,

1972 (copies to be sent to the parties), after which this Court will issue an order ordering the parties to execute an agreement deemed by the Court to be reasonable and in compliance with the order of the Department of Environmental Resources (dated September 10, 1971) and The Clean Streams Law, *supra*, subject thereafter to sanctions."

Filed simultaneously with this adjudication is an Opinion and Order pertaining to exceptions which were filed by Derry to the Order of this Court dated July 31, 1972, in which we dismissed Derry's exceptions and making said Order of this Court final.* The matter is now ripe for a final adjudication.

### FINDINGS OF FACT

1. Derry Township (Derry) and Unity Township (Unity) are second class townships. Youngstown Borough (Youngstown) and Latrobe Borough (Latrobe) are boroughs. The Latrobe Municipal Authority (Latrobe Authority) is a municipal authority organized under the Municipal Authorities Act of 1945, Act of May 2, 1945, P. L. 382, as amended, 53 P.S. §301 et seq. (Where applicable, the term "municipalities" shall include all four municipalities, unless otherwise designated by name.)

2. Parts of all of the municipalities are in the watershed of the Loyalhanna Creek.

3. The Latrobe Authority is authorized to have five Board members by its articles of incorporation. At the time of hearing, Latrobe Authority had four members. It is divided into two divisions, namely, a sewer division and a water division.

4. On July 1, 1963, the Latrobe Authority issued sewer bonds in the amount of one million eight hundred

---

* The Opinion of the Court on *Derry's* exceptions is reported herewith at the end of Court's Order on final adjudication. Reporter.

thousand dollars to finance the construction of a primary sewage treatment plant located in the northwest corner of Latrobe. Also constructed was an interceptive sewer running parallel with the Loyalhanna Creek from the southwest corner of Latrobe along the creek to the treatment plant. Since 1964, the two divisions of Latrobe Authority have served 6,000 water customers and 3,500 sewer customers. Approximately 2,500 of the water customers are residents of the surrounding municipalities.

5. Since 1963, the two divisions of Latrobe Authority have shared the cost of jointly-used employes and facilities, which include a $400,000 office building. The cost of jointly-used assets is $88,000 per year. The sewer division is charged by the water division for $33,-000 of that cost. Over the years, Latrobe Authority has constructed interceptive sewer facilities to take sewage of other municipalities.

6. Latrobe Authority's plant was constructed for primary sewage treatment, which required a minimum of 35 percent treatment of the sewage.

7. Since 1963, Latrobe Authority has extended its sewage system into a new high school situated in Unity in 1966, and in 1969, into Derry, to serve several industries and a country club. On May 14, 1969, Latrobe Authority entered into a service agreement with Derry for sewage service from the "Loyalhanna Industrial Park." This service agreement does not provide for any representation by Derry on the Board of Latrobe Authority, nor does it provide for any expansion of sewage service in Derry Township without the consent of Latrobe Authority.

8. On May 27, 1970, DER issued an order to Latrobe Authority to expand its present plan to provide secondary treatment, rather than primary treatment of its sewage. Latrobe Authority did not comply with said

order, but rather urged DER to compel surrounding municipalities along the subject watershed to construct collector sewage systems compatible with Latrobe Authority's plans for expansion.

9. In September 1971, DER issued orders to Derry, Unity and Youngstown (a) to construct and operate sewage systems and treatment facilities to properly provide for the prevention of pollution and public health nuisances within their respective municipal boundaries in said watershed within two years of the date of the order, (b) to submit plans within 90 days indicating the areas to be served and the treatment facilities required, (c) to submit a schedule of steps to be taken for implementation to be filed within 120 days of the order, and finally, (d) to negotiate and enter into agreements with any municipality authority or agency necessary to comply with the order, specifically mentioning Latrobe Authority.

10. No appeal was ever taken by Derry, Unity or Youngstown from DER's orders of September 1971.

11. Derry, Unity and Youngstown were specifically notified of their right to file an appeal from the orders of September 1971.

12. There were many meetings and conferences held between the various parties involved in an effort to resolve the many problems surrounding the sewage pollution in the watershed of Loyalhanna Creek.

13. The existing sewage facility of Latrobe Authority cost approximately three million dollars, of which $1,800,000 was locally financed by 40-year sewer revenue bonds at a rate of approximately 3.5 percent interest. The present balance of indebtedness is $1,605,-000. Since 1963 the Latrobe Authority has paid $754,-575 for debt-service costs for the 1963 construction, and will have paid $1,015,275 for debt service payments by July 1, 1975, when it is estimated that a regional plant could be completed.

14. On June 19, 1972, DER issued orders to Latrobe Authority and Latrobe to negotiate an agreement with three surrounding municipalities of Derry, Unity and Youngstown by July 7, 1972. Latrobe Borough and Latrobe Authority appealed from this order; both appeals are still pending.

15. On July 10, 1972, the Commonwealth filed a petition to adjudge the respondents named in the caption above in contempt for their failure to comply with the various orders of DER mentioned above.

16. At the hearing held before this hearing Judge, Latrobe, Latrobe Authority, Unity and Youngstown agreed and stipulated for the record their agreement to resolve the issues. That stipulation is set forth in the record. Derry, however, refused to settle its differences, and therefore, was not a party to the settlement agreement.

17. The watershed of Loyalhanna Creek is polluted and is being further polluted by a lack of, or inadequate, sewage treatment facilities, which could be remedied by a regional sewage facility serving the four municipalities, which are respondents in this case.

18. None of the parties to this action have executed the agreements ordered by DER, or stipulated by the parties on the record in this case.

19. Latrobe Authority has offered to expand the authorized number of Board members to nine members, six of whom would be appointed on the recommendation of the Latrobe Borough Council and one member each to be appointed under recommendation of Derry, Unity and Youngstown. The three members recommended by Derry, Unity and Youngstown would have full voting rights on all matters pertaining to the sewer division of the Latrobe Authority. Derry has rejected this offer, demanding instead representation on the Latrobe Authority by population, while refusing to contribute to

the incurred and existing cost and investment in the sewer division of Latrobe Authority.

## DISCUSSION

As stated in the Pennsylvania Constitution, this Court shall have such jurisdiction as shall be provided by law. *See* Pennsylvania Constitution of 1968, Article V, Section 4. The General Assembly has provided the jurisdiction of this Court to find a municipality in contempt for failing to comply with an order of DER, and to punish such corporate authorities for their statutory contempt in an appropriate manner. This statutory authority is found in Section 210 of the Clean Streams Law, 35 P.S. §691.210, wherein it is stated : "It shall be the duty of the corporate authorities of a municipality upon whom an order is issued pursuant to section 203 of this act to proceed diligently in compliance with such order. If the corporate authorities fail to proceed diligently, or if the municipality fails to comply with the order within the specified time, the corporate authorities *shall be guilty of contempt* and shall be punished by the court in an appropriate manner and, for this purpose, application may be made by the Attorney General to the Court of Common Pleas of Dauphin County, until such time as the Commonwealth Court comes into existence and thereafter the Commonwealth Court instead of said Court of Common Pleas of Dauphin County, or to the court of common pleas of the county wherein the municipality is situated, which courts are hereby given jurisdiction." (Emphasis added.)

It is apparent from a reading of the Clean Streams Law that the Legislature, as a matter of public policy, has provided for an extraordinary remedy, or enforcement, to the end that the waters of this Commonwealth be as free from unnecessary pollution as is reasonably possible. It goes without question that the courts of

this Commonwealth have the power to restrain an agency of the Commonwealth from ordering the unreasonable. In this case, there is no contention by any of the parties that the watershed of Loyalhanna Creek is not being polluted by inadequate, or absence of, sewage treatment facilities. None of the parties has contended that what DER has ordered is unreasonable.

The Legislature and this Court are faced with a very unusual factual situation wherein everyone is in agreement that adequate sewage facilities are necessary and possible to eliminate a public nuisance, but the municipalities cannot agree on the proper procedure or terms of agreement to eliminate the public nuisance. We can find no case which would authorize a court to order municipal officials to sign any document. In light of that situation, the Legislature has provided a means by which the courts may force parties into agreements to eliminate a public nuisance through legal coercion. The Legislature, in Section 210 (35 P.S. §691.-210) quoted above, has stated that failure to comply with a final order of DER constitutes contempt. We have made a finding that by virtue of the fact that Derry had not taken advantage of its procedural right to appeal, it is now in a position of noncompliance with the DER order of September 10, 1971 and is thereby automatically in contempt. The question arises, under the wording of Section 210, whether or not sanctions may be applied to the recalcitrant municipality, here Derry. We can find no authority for this Court to levy a fine in the form of a sanction as a matter of contempt of an administrative agency's order. We have resolved this very complex problem by concluding that after a finding of sufficient facts to support the statutory contempt as stated in Section 210 of the Clean Streams Law this Court can levy sanctions by way of a fine for the failure of a municipality to comply with an

Order of this Court ordering compliance of the Administrative Agency's order.

In the case of *Knaus v. Knaus*, 387 Pa. 370, 127 A. 2d 669 (1956), our Supreme Court laid down the differences between civil and criminal contempt. In that case, it was held that the purpose of criminal contempt is to vindicate the dignity and authority of the court, and to protect the general public. Whereas the purpose of civil contempt is remedial in nature with judicial sanctions employed to coerce the recalcitrant party into compliance. In this case, DER is attempting to coerce the municipality and the authority into compliance with its orders. Therefore the dominant purpose of the action is compliance, and the contempt is civil in nature. In view of the fact that this is not a proceeding for a criminal contempt, the Act of July 23, 1931, P. L. 925, §2, 17 P.S. §2048 which restricts a fine for contempt to $100.00 is not applicable. We therefore conclude that if the parties ordered by this Court to comply with DER's orders do not comply, then we have ample authority to levy a civil contempt fine in the amount of $500.00 per day, as requested by DER.

At this writing, the record does not indicate that any of the parties to this action have complied with the orders of DER. We will therefore include in our order a provision for all of the parties who may not be in compliance. The reason for this statement is the fact that the record and the order of this Court dated July 31, 1972, provide that the stipulated agreement be reduced to writing within 30 days of the date of that order.

In the Opinion and Order filed simultaneously herewith, we have registered our holding that Derry was afforded its due process protection by virtue of its right to appeal, as it was notified by the letter accompanying DER's order of September 10, 1971. We note,

however, that so long as an administrative agency or the Legislature has provided a duly published procedure for a hearing or appeal after such an order, it is not a requirement that it must also extend additional notice of such rights. We recommend, approve and encourage administrative agencies to extend such procedural courtesy, as DER extended in this case, in the interest of an orderly record and so as to advise citizens of their rights which might be otherwise overlooked. We have also discussed the propriety of DER utilizing the petition to adjudge respondents in contempt of court in the Opinion simultaneously filed. The discussions and holdings therein apply with equal force here, and are made a part hereof by reference thereto.

At the argument before this Court, Derry's counsel contended that the only reservation that Derry had to the establishment of a regional sewage system and facility was that it obtain effective representation on Latrobe Authority's Board of Directors. As the recorded stipulated agreement discloses, Latrobe Authority offered to expand its Board of Directors, and to commit itself to accept as one of its Directors a representative recommended by each of the participating municipalities of Derry, Unity and Youngstown. Derry contends that it must have representation so that it will be fully informed of all of the financing and operations of the sewage system, as it may affect the citizens of Derry. Derry reasonably argued that without such representation the rates for sewage to be charged by Latrobe Authority would be based upon unknown facts and statistics. Although Latrobe Authority is presently authorized to have five members on its Board, it had at the time of the hearing, only four. In its recorded stipulated agreement it proffered to expand its Board to nine (six appointed by Latrobe and three by the other municipalities). We can find no support in the

record, nor any logical reason to so extend Latrobe's representation; quite to the contrary, because the issue revolves about the question of adequate representation, there is logic to maintain Latrobe's representation to its level of four and expand same to include one additional Board member for each of the three other municipalities, or a total of seven. The Order which follows will provide for representation by Derry and will adequately protect the citizens of Derry. Insofar as the rates for sewage service are concerned, the Legislature has adequately provided a means whereby any customer of an authority may challenge the rates or rate schedule of an authority in the Courts of Common Pleas. *See* Municipality Authorities Act of 1945, Act of May 2, 1945, P. L. 382, as amended, 53 P.S. §306B (h). *See also Turley v. North Huntingdon Township Municipal Authority,* 5 Pa. Commonwealth Ct. 116, 289 A. 2d 509 (1972).

CONCLUSIONS OF LAW

1. All the orders involved in this case were issued by DER and directed to the parties pursuant to Section 203 of the Clean Streams Law (35 P.S. §691.203).

2. The DER orders directing Latrobe and Latrobe Authority dated June 19, 1972 were appealed to the Environmental Hearing Board pursuant to Section 7 (a) of the Clean Streams Law (35 P.S. §691.7(a)), and such appeals are deemed to be supersedeas.

3. The DER order dated May 27, 1970, directing Latrobe Authority to upgrade its sewage facilities for secondary treatment was not appealed; and the time extension granted by DER now having expired, Latrobe Authority would be a proper party for a contempt finding pursuant to Section 210 of the Clean Streams Law (35 P.S. §691.210), except for the fact that DER withdrew its petition for contempt against Latrobe Authority.

4. Unity's and Youngstown's failure to appeal the DER orders of September 1971 also makes them proper subjects for contempt proceedings, pursuant to Section 210 of the Clean Streams Law, except for the fact that the Commonwealth has withdrawn its petition for contempt against Unity and Youngstown.

5. Derry, having failed to appeal the order of September 10, 1971, makes it a proper subject for a contempt proceeding pursuant to Section 210 of the Clean Streams Law (35 P.S. §691.210).

6. Representation according to population is not required in this case as the Latrobe Authority is an appointed body. See Sailors v. Board of Education of the County of Kent, 387 U.S. 105 (1967).

7. The Municipality Authorities Act of 1945, Act of May 2, 1945, P. L. 382, §3.1, as amended, 53 P.S. §304, grants a municipality authority, such as Latrobe Authority, discretion in determining whether nonmember municipalities shall be permitted to join said authority. The Court may require that such discretion be exercised as found to be reasonable. See Falls and Middletown Townships v. Lower Bucks County Joint Municipal Authority, 45 Pa. D. & C. 2d 381 (1968).

8. Under the provisions of Section 210 of the Clean Streams Law (35 P.S. §691.210), the Court may find Derry Township, or any of the other parties, to be in contempt of orders of DER from which no appeals have been taken and this Court may punish any such party guilty of such contempt in an appropriate manner.

9. The provisions of the stipulated agreement, as set forth on the record, are reasonable and should be approved for all of the parties involved in this suit.

10. In carrying out the legislative intent of the Clean Streams Law, the development of a regional sewage system and facilities to reduce or eliminate sewage pollution of said watershed will be of great benefit to the citizens of the four municipalities in-

volved and to all citizens who utilize the water downstream of the watershed.

Based upon the foregoing, we now

## ORDER

AND NOW, this 21st day of November, 1973, it is hereby ordered that the Latrobe Municipal Authority, Latrobe Borough, Youngstown Borough, Unity Township and Derry Township comply with all of the orders of the Department of Environmental Resources, to which appeals have not been filed, and to submit for approval to this Court within 30 days hereof an agreement substantially following the stipulated agreement set forth in the record of this case at the hearing held July 25, 1972 at Greensburg, Pennsylvania, including by way of description, and not by way of limitation, a provision whereby the Board of Directors of Latrobe Authority will be expanded from its present (at the time of hearing) four members to seven members and whereby three of the seven members will represent the municipalities of Youngstown Borough, Unity Township and Derry Township, with each having one representative member recommended by the governing body of those municipalities and automatically accepted by the appointing authority of Latrobe Authority; and be it further ordered that upon failure of Latrobe Authority, Latrobe Borough, Youngstown Borough, Unity Township or Derry Township to comply with this Order shall be deemed to be a violation of an Order of this Court and thereby subject them to sanctions.

---

OPINION ON EXCEPTIONS FILED TO THE COMMONWEALTH COURT ORDER OF JULY 31, 1972

OPINION BY JUDGE KRAMER, November 21, 1973:

This case comes within the original jurisdiction of this Court. The subject matter of this opinion involves

exceptions filed by Derry Township (Derry) to an order of this Court dated July 31, 1972, in which this Court found Derry to be in contempt as provided in The Clean Streams Law, Act of June 22, 1937, P. L. 1987, §210, as amended, 35 P.S. §691.210.

Filed simultaneously herewith is another adjudication arising out of this same case, and all of the findings of fact contained in that adjudication apply with equal force here and are made a part hereof by reference thereto. In an effort to give the order set forth at the conclusion hereof some meaning, however, we will set forth in summary fashion pertinent facts.

At the foundation of all matters pertaining to this case is one undisputed fact, i.e., that the watershed, into which the sewage of the described watershed areas of Latrobe Borough (Latrobe), Youngstown Borough (Youngstown), Unity Township (Unity) and Derry flow, has been polluted for some time, and is now being polluted, by untreated or "improperly" treated sewage of those municipalities. Furthermore, it is indeed most unfortunate that these complicated and protracted proceedings have unduly delayed the cleansing of sewage pollution to the detriment of the health, welfare and safety of the citizens not only of the municipalities involved but of all other citizens downstream of the subject polluted area.

For some considerable period of time prior to September 1971 the Department of Environmental Resources (DER) investigated and studied the discharge of sewage waste into said watershed, culminating in the various actions taken by DER in this case. The record establishes that in 1963 the Latrobe Municipal Authority (Latrobe Authority) (organized in 1943) commenced proceedings to construct a sewer system along Loyalhanna Creek which eventually served approximately 3,500 sewer customers in Latrobe and said sur-

rounding municipalities. The record indicates that as late as 1969 Latrobe Authority extended its service into Derry Township to take care of the sewage of several industrial customers and a country club. In 1970 DER ordered Latrobe Authority to provide secondary treatment of its sewage in place of the then existing primary treatment facility. Because of the expense involved in expanding its sewage treatment plants as required by DER, Latrobe Authority urged DER to compel the surrounding municipalities to construct their respective sewage systems so as to become functionally compatible with the planned expansion program of Latrobe Authority.

As a result of these developments, on September 10, 1971, DER, through its Director of Division of Water Supply and Sewage, issued an "Order" directing Derry (1) to construct and operate sewage systems and sewage treatment facilities to provide for the prevention of pollution and public health nuisances in Derry within two years of the date of the order, (2) to submit within 90 days a plan, (3) to submit within 120 days a schedule of implementation, and (4) to negotiate with and enter into agreements with any municipality or authority (specifically mentioning Latrobe Authority) whose existing or proposed facilities may be necessary to comply with the order. At this point it is important to relate that Unity and Youngstown received similar orders of DER, and that Latrobe Authority had received (prior to the Derry order mentioned above) an order to upgrade its sewage plant. Later, Latrobe Authority and Latrobe were further ordered in June of 1972 to regionalize the Latrobe Authority sewage treatment facility so as to include Derry, Unity and Youngstown. Latrobe and Latrobe Authority appealed from those orders and said appeals are pending.

Accompanying the September 10, 1971 order to Derry, which the record clearly shows was received by

Derry, was a letter explaining that the order was issued "pursuant to Section 203 of the Clean Streams Law, as amended." (35 P.S. §691.203, P. L. 1987, article II, §203 as significantly amended by the Act of July 31, 1970, P. L. 653, No. 222, §5.) The letter made specific reference to DER's Rules of Practice and Procedure Relating to Appeals and enclosed a copy of Section 21.21 of such rules.[1]

*None of these municipalities ( Derry, Unity or Youngstown) ever took an appeal from their respective DER orders dated in September of 1971.* The record indicates that there followed meetings, conferences and correspondence wherein DER prodded the municipali-

---

[1]
"INSTITUTION OF PROCEEDINGS
"§21.21. Appeals.

"(a) In cases where appeals are authorized by statute or regulation of the department, such appeals shall be in writing and shall be filed with the board within fifteen (15) days from the date of service of written notice of an action of the department or local agency.

"(b) The appeal shall set forth the name, address and telephone number of the appellant and shall include or be accompanied by a copy of the written notification of the action of the department or local agency and a specification of objections setting forth the manner in which appellant is aggrieved by such action and the relevant issues to be resolved by the board. The appellant shall, within 48 hours after filing an appeal, serve a copy of the appeal on the officer of the department issuing the order and on the Attorney General c/o Office of Legal Counsel of the Department of Environmental Resources.

"(c) Failure to comply with this section shall be a sufficient basis for dismissing the appeal. The action of the department or local agency shall be final as to any person who fails to file an appeal or to perfect an appeal pursuant to this section.

"(d) The board upon written request filed within the fifteen day period set forth in paragraph (a) and for good cause may extend the time for the filing of an appeal to thirty (30) days from the date of service of written notice of an action of the department or local agency."

ties and the Authority to take action concerning the sewage problem in the Loyalhanna Creek watershed with some progress but no meaningful action. On July 10, 1972, DER filed a petition to adjudge all of the municipalities and the Authority in contempt for their failure to abide by the various orders of DER. At the request of all the parties, this Court assigned one of its judges to sit specially in the county seat (Greensburg) of Westmoreland County to hear evidence on the petition. A conciliation conference was held with counsel for all the parties present, and all of the issues were settled at that time between Latrobe, Latrobe Authority, Unity and Youngstown. Derry would not agree to the stipulated agreement and the hearing proceeded. The stipulation was set forth on the record, and DER withdrew its petition for contempt against the four stipulating parties, but requested the Court to proceed against Derry.

On July 31, 1972 the hearing judge of this Court issued an order in which generally: (1) the settlement agreement set forth on the record was approved and ordered to be reduced to writing and signed within 30 days; (2) Derry having failed to comply with the September 10, 1971 order of DER was found to be in contempt, in accordance with the Act of June 22, 1937, P. L. 1987, as amended, 35 P.S. §691.210; (3) Derry was ordered to enter into diligent negotiations immediately with Latrobe Authority until August 10, 1972, after which date if no agreement was reached between Derry and Latrobe Authority the negotiations would continue before a Master appointed by the Court. Negotiations were held before the Master and concluded with no agreement having been reached between Derry and Latrobe Authority. At this writing there is nothing in the record to indicate whether any of the parties have ever reached or signed an agreement complying

with any of DER's orders, the result being the continued pollution of the Loyalhanna Creek watershed due to a lack of, or improper, sewage treatment by the municipalities and the Authority involved.

In any event, on August 10, 1972 Derry filed exceptions in which it alleged: (1) that this Court is without jurisdiction, (2) that the DER order of September 10, 1971 violates the constitutional rights of Derry and its citizens, and (3) that the order was contrary to the evidence and law. Although Derry reserved the right to file additional exceptions, none were forthcoming. In its brief on the exceptions, Derry has abandoned its argument pertaining to the jurisdiction of the Court, and we will pass upon the remaining two questions raised.

Derry contends that in view of the fact that no hearing was held prior to September 10, 1971, the procedure used by DER violates constitutional due process. Under the applicable law herein discussed, there is no merit to Derry's argument.

There can be no question that the Legislature has invested DER with the duty to initiate, organize and enforce a comprehensive program of watershed sewage management and control. *See* Sections 4(5) and 5(a) of the Clean Streams Law (35 P.S. §§691.4(5) and 691.-5(a)). Sections 201 and 202 of the Clean Streams Law (35 P.S. §§691.201 and 691.202) require municipalities to obtain permits before discharging sewage in any manner into the waters of the Commonwealth. Section 207 (35 P.S. §691.207) requires all plans and relevant data to be submitted to DER. The power of DER to issue an order requiring municipalities to file reports and to "acquire, construct, repair, alter, complete, extend, or operate a sewer system or treatment facility, or to negotiate with other municipalities for combined or joint sewer systems or treatment facilities" is found

in Section 203(b) of the Clean Streams Law, 35 P.S. §691.203(b).[2]

Derry argues that DER is subject to Section 31 of the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, 71 P.S. §1710.31 wherein it is provided that no adjudications may be made by an administrative agency without reasonable notice of a hearing. The answer to this contention, however, is found in the fact that Derry has conveniently overlooked Section 1921-A of The Administrative Code of 1929, Act of April 9, 1929, P. L. 177, as amended, 71 P.S. §510-21, which reads: "(c) Anything in any law to the contrary notwithstanding, *any action of the Department of Environmental Resources may be taken initially without regard to the Administrative Agency Law,* but no such action of the department adversely affecting any person shall be final as to such person until such person has had the *opportunity to appeal* such action to the Environmental Hearing Board; *provided, however, that any such action shall be final as to any person who has not perfected his appeal in the manner hereinafter specified."* (Emphasis added.)[3]

Derry complains that it was not given the right to a hearing. The record in this case does not substantiate that argument. The facts are that Derry had the right

---

[2] 35 P.S. §691.203(b)

"The department may from time to time order. . . . Such orders may include, but shall not be limited to, orders requiring municipalities to undertake studies, to prepare and submit plans, to acquire, construct, repair, alter, complete, extend, or operate a sewer system or treatment facility, or to negotiate with other municipalities for combined or joint sewer systems or treatment facilities. . . ."

[3] The Environmental Hearing Board did not come into existence until the Governor's proclamation on February 15, 1972, and until then DER exercised those powers under the provisions of Section 35 of the Act of December 3, 1970, P. L. 834, 71 P.S. §510-108.

to appeal the September 10, 1971 order of DER. If Derry had taken such an appeal it would have been provided the opportunity to present whatever evidence it desired. The fatal flaw in Derry's argument is Derry's failure to take the provided for appeal. Hence, Derry thereby waived its right. *Compare First National Bank of Milford v. Department of Banking,* 4 Pa. Commonwealth Ct. 168, 286 A. 2d 480 (1972). Furthermore, there is authority for a governmental agency acting in the area of public health to order necessary action without prior hearing. *See Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594 (1949).

Derry patently admits it received the order of September 10, 1971, and having had the opportunity to be heard through an appeal provided under the rules of DER (notice of the opportunity to appeal was given by the accompanying letter), Derry cannot now claim to have been deprived of constitutional due process.

In this regard, Derry also contends that the procedure utilized by DER in this case was improper. In substance, Derry states that the use of a petition to adjudge it in contempt was improper because Pa. R. C. P. No. 1007 requires that an action be commenced only by "(1) a praecipe for a writ of summons, (2) a complaint, or (3 ) an agreement for an amicable action." Our Supreme Court has recently ruled otherwise under certain circumstances. In *Pennsylvania Crime Commission Petitions,* 446 Pa. 152, 285 A. 2d 494 (1971), in an appeal from an opinion of this Court, 2 Pa. Commonwealth Ct. 650 (1971), the Supreme Court ruled: "The Appellate Court Jurisdiction Act, §401, *supra,* in investing the Commonwealth Court with jurisdiction, speaks of 'actions and *proceedings.*' (Emphasis added.) While the vast majority of legal proceedings of a civil nature brought in this Commonwealth are 'actions' of one sort or another, and must therefore be

commenced and prosecuted comformably to the Rules of Civil Procedure, including Rule 1007, it is apparent that there are some proceedings which are not within that category." 446 Pa. at 159, 285 A. 2d at 498. The law of this Commonwealth is that where the Legislature establishes a specific procedure, it thereby creates an exception to the general rule governing the commencement of actions. In Section 210 of the Clean Streams Law (35 P.S. §691.210), the Legislature has provided such an exception. That portion of the statute reads as follows: "It shall be the duty of the corporate authorities of a municipality upon whom an order is issued pursuant to section 203 of this act to proceed diligently in compliance with such order. If the corporate authorities fail to proceed diligently, or if the municipality fails to comply with the order within the specified time, the corporate authorities *shall be guilty of contempt and shall be punished by the court in an appropriate manner* and, for this purpose, application may be made by the Attorney General to the Court of Common Pleas of Dauphin County, until such time as the Commonwealth Court comes into existence and thereafter the Commonwealth Court instead of said Court of Common Pleas of Dauphin County, or to the court of common pleas of the county wherein the municipality is situated, which courts are hereby given jurisdiction." (Emphasis added.)

Lastly Derry argues that the Court's finding of Derry to be in contempt is contrary to the law and evidence. The record in this case clearly establishes that Derry has not complied with the September 10, 1971 order of DER, and under the very clear wording of the statute (35 P.S. §691.210, quoted above) is guilty of contempt. There is sufficient evidence in this record to support the finding of contempt. We therefore

ORDER

AND NOW, this 21st day of November, 1973, based upon the above discussion the exceptions dated August 9, 1972 filed by Derry Township Supervisors in the above-noted case are hereby dismissed. The Order of this Court dated July 31, 1972 is hereby made final, and in accordance with Pa. R. C. P. No. 1519, the Prothonotary of this Court shall notify all parties or their attorneys of the entry of this Order.