## Borough of Lake City v. D.E.R.

*Paul F. Burroughs,* for Environmental Hearing Board.

*Warren W. Bentz,* for Borough of Lake City.

MAZULLO, *Member,* July 15, 1983—A proposed adjudication in this matter was drafted by Dennis J. Harnish, Esq., formerly Chairman of the Environmental Hearing Board who has been appointed as a hearing examiner in the above-captioned matter. In preparing the proposed adjudication Mr. Harnish reviewed the notes of testimony taken during a hearing held on March 9, 1981 as well as the exhibits introduced during that hearing and the post-hearing briefs filed by appellant and DER. This proposed adjudication has been reviewed and adopted by the board.

### FINDINGS OF FACT

1. The Borough of Lake City is a municipality located in Erie County, Pa.

2. For a period from at least April 20, 1970 until August 8, 1980, the Borough of Lake City operated

a solid waste disposal site within the borough, located on property owned by the Lake City Municipal Sewer Authority along Maple Road and situate on the bank of Elk Creek, a tributary to Lake Erie.

3. The Lake City solid waste disposal site required a solid waste management permit.

4. Lake City Borough has never obtained a permit to operate the solid waste disposal facility as required by the Solid Waste Management Act, the Act of July 31, 1968, P.L. 788, as amended, 35 P.S. §6001 *et seq.*

5. Lake City Borough officials knew that such a permit was necessary to operate the facility.

6. The borough sold dumping permits to persons wishing to dispose of wastes at the site. These permits were sold at least during the period from 1973 through 1979. The price for a dumping permit was seven dollars and fifty cents per year and approximately 200 permits were sold each year.

7. The wastes deposited at the site included appliances, commercial wastes, lumber, trees, brush, cans, pallets, oil cans, car tires, and residential wastes.

8. In 1970, Lake City Borough made application for a permit to operate a solid waste disposal facility at the subject site; however, the application was incomplete and not pursued by the borough to permit issuance.

9. By letter dated December 4, 1978, the borough was again advised to either close the site or obtain the proper permit.

10. Lake City Borough officials agreed to close the solid waste disposal facility no later than November 1, 1979.

11. On October 22, 1979, a meeting was conducted among DER, Lake City Borough and Erie County Department of Health officials to discuss

the closure of site. The date for closure of the site was postponed to November 30, 1979.

12. At this meeting, Borough officials were advised of the disposal alternatives available to them.

13. On or about July 16, 1980, a portion of the solid waste disposal site including wastes, soil, and vegetation broke away and slid into Elk Creek.

14. Solid wastes from the site were observed having entered into Elk Creek.

15. Approximately 60 to 100 feet of stream bank was strewn with wastes and the wastes extended approximately ten to 20 feet into the stream.

16. Approximately two-thirds of the solid waste site had slid down the hillside.

17. By certified letter, dated July 22, 1980, Lake City Borough was formally advised by the DER's representative that the site had slid into Elk Creek and that that constituted a violation of the Solid Waste Management Act.

18. Lake City Borough received the July 22, 1980 letter as evidenced by a signature on a return receipt card.

19. On August 8, 1980, the site was still open and wastes were being deposited by borough employees.

20. The wastes being deposited on August 8, 1980 were Class II wastes as defined at 25 Pa. Code §75.33.

21. Subsequent to the July, 1980 incident wherein portions of the site broke away into Elk Creek, the DER's Office of Resources Management agreed to undertake certain remedial activities to aid Lake City Borough in effecting a solution to the problem.

22. Lake City Borough and the DER's Office of Resources Management entered into an agreement for the removal of the wastes from Elk Creek and its

flood plain and redeposition of the wastes onto the site.

23. The agreement did not address entirely the concerns of the Bureau of Solid Waste Management.

24. Scrap metals and appliances were stored at the site and were still being so stored as of March 2, 1981.

25. On August 26, 1980, DER issued an order closing the site and requiring various remedial measures, including stabilization of slopes and providing a vegetative cover.

26. The August 26, 1980 order is the subject of this appeal.

27. A principal purpose for the issuance of the order on August 26, 1980 was to supplement the obligations of Lake City Borough under its agreement with DER's Office of Resources Management.

28. The site did not receive two feet of final cover material as required by 25 Pa. Code §75.24(c)(2)(xxi) and as required by the DER's order.

29. The determination of inadequate cover was made by the Regional Solid Waste Manager by observation of wastes being exposed and by the Acting Regional Solid Waste Operations Supervisor.

30. Full compliance with the vegetation and seeding requirements of the order could not be determined until a full growing season expired.

31. The borough did not utilize the services of its engineer in closing the site.

32. The consensus of the Borough Council in order to close the dumping site was to just close the access way and prohibit further dumping.

33. Located on the parcel is a building described as a "smokehouse" for firefighter training, and

near the smokehouse are barrels with contents that give off the odor of oil.

34. Oil stains were seen on the ground adjacent to said smokehouse.

## DISCUSSION

Like many municipalities throughout this Commonwealth, Lake City Borough, Erie County, (appellant), for many years after the effective date of the Solid Waste Management Act, the Act of July 31, 1968, P.L. 788, as amended, 35 P.S. §6001 *et seq.*, operated a municipal landfill without the authorization of a permit issued by DER.

As long ago as April of 1970, Mr. Russell L. Crawford, who was at that time an inspector for DER, advised appellant that it was required to obtain a permit from DER for appellant's landfill located on a parcel of property defined on the south by Route 5, on the east by Maple Street and on the west by Elk Creek (a tributary of Lake Erie which reports to the lake within a mile of the site).

DER, on the basis of Mr. Crawford's inspection, also advised appellant of certain operational violations including the dumping of wastes on the flood plain of Elk Creek as well as on the steep hillside leading from the (roughly flat) top of the site down to said flood plain.

A reinspection by Mr. Crawford, on July 1, 1970, indicated that appellant had undertaken certain efforts to correct the problems noted in DER's notice of violation. It had opened a small trench on the top of its site and had placed some soil on the waste on the hillside. Mr. Crawford, however, noted the absence of even a six inch daily covering of earth on the waste in the trenches and that the waste deposited therein was burning. Thus, on

November 19, 1970, Mr. Crawford again wrote to appellant concerning its violations and again emphasized the necessity for appellant to obtain a permit for its site.

Appellant again made an attempt to comply with DER's directive, this time by having Hill and Hill engineers prepare and submit an application for a Solid Waste Management permit to DER on December 11, 1970. Unfortunately, the said application was incomplete and although the Borough was so informed, its application was never revised and no solid waste management permit was ever issued for the site.

Notwithstanding appellant's failure to comply with DER's directives, a lengthy period of benign neglect followed the flurry of action in 1970. Indeed, it was not until December 4, 1978 that appellant was again informed of the need to obtain a permit or close its landfill. This notice was contained in a letter from the Erie County Health Department (ECHD) which was performing inspections, as DER's agent, under the Pennsylvania Solid Waste Management Act.

On October 9, 1979, ECHD, again wrote to appellant and this time the ECHD ordered appellant to close its landfill by November 1, 1979.

This letter finally attracted the attention of appellant's elected officials and on October 22, 1979 a meeting was held among representatives of DER, ECHD and appellant at which meeting the appellant agreed to close its site by November 30, 1979.

Appellant's secretary, Joyce Andrews, and Mr. George Bax, President of appellant's council testified that appellant did close its site promptly after the October 22, 1979 meeting. However, Mr. Bax admitted, on cross-examination, that the site had

not been closed in accordance with DER's regulations; e.g., appellant did not even attempt to provide two feet of earth as a final cover.

Appellant's view of what was involved in closing its site is succinctly summarized by the following colloquy between Mr. Bax and the hearing examiner.

"THE HEARING EXAMINER: Do you think that you could just close the gate one day and not do a darn thing with it thereafter and that that would be legal?

THE WITNESS: Yes. I believe that was the consensus of council.

THE HEARING EXAMINER: No matter what was sitting there, all you had to do was close the gate, not let anybody on there, and you'd have no more problems?

THE WITNESS: If we had no more dumping, we figured we had no more problems."

Appellant figured incorrectly. On or about July 17, 1980 a section 60 to 100 feet wide of the solid waste which had been dumped on the steep hillside slipped into Elk Creek. Moreover, on the day Mr. Crawford witnessed the aftermath of this "waste slide," August 6, 1980, he also witnessed the dumping of additional solid wastes at the allegedly closed site from one of appellant's trucks. The testimony of Sean D. Johnston driver of the truck and at that time a CETA employee of appellant's as well as the testimony of his supervisor, Dale Vogt, appellant's superintendant, indicate that this was an isolated incident and involved only tree branches. This incident, nevertheless, provides a paradigm of the rather cavalier attitude displayed over the years by appellant toward its responsibilities under the Solid Waste Management Act.

We are not unmindful of appellant's limited resources and we commend appellant for continually attempting to address its problems.[1] We also commend DER's Division of Stream Improvement which Division cooperated with appellant, after the waste slide, to redeposit some of this waste in new trenches on top of the site and to insure that this area was covered and reseeded.

Unfortunately, appellant's efforts, even as aided by the Division of Stream Improvement, were just not sufficient to bring its site into compliance with the Solid Waste Management Act and the regulations thereunder. The entire site was not covered with two feet of earth; wastes protrude from the ground in places. Moreover, a substantial pile of scrap metal including a box car, water tanks, appliances, spouting and scrap metal is located on the site. The site also includes a number of drums of an oily substance and a reservoir of the same substance which substance is allegedly utilized to produce smoke in the fireman's training shanty located on the site. It is not clear from the record what official connection, if any, the fireman have with appellant, but as owner and occupier of the site appellant has responsibility under both common law and The Clean Streams Law and Pennsylvania Solid Waste Management Act to police all activities thereupon. That this material had not been properly handled is evidenced by the oily ground surrounding these drums.

---

1. In this regard, we note that appellant charged users of its dump permit fees over the many years it operated this site in violation of the Solid Waste Management Act. Perhaps had appellant plowed some of this money back into its landfill by plowing under the waste exposed thereat, the instant order need never have been issued.

On August 26, 1980, DER issued an order closing the site and requiring certain remedial steps including removal of the scrap metals, refraining from burning solid wastes on the site, diverting surface water to and stabilizing steep slopes thereon to minimize the chance of further slides, providing a final compacted cover of two feet throughout the site and seeding and mulching all disturbed areas on the site.

As to the closure position of the order there can be no doubt that it is supported by the law and facts; no person or municipality can operate a landfill on its property without a permit from DER. Joseph C. Delenick d/b/a St. Clair Landfill v. DER, 24 Pa. Commw. 577, 357 A. 2d 736 (1976); John T. Ryan v. DER, 30 Pa. Commw. 180, 373 A. 2d 475 (1976). With regard to the remedial portion of the order we are mindful that it is DER which has the expertise in fashioning orders to address violations of the acts it enforces; this board will reverse or modify a DER order only if we find that DER abused its discretion in issuing that order; Baughman v. Commw., DER, 1979 EHB 1; Agosta v. Commw., DER, 1977 EHB 88; Pisani v. Commw., DER, 1975 EHB 117.

In view of the circumstances discussed above we can't find DER's order to be excessive. If anything DER has been too lenient with appellant. Had appellant's landfill been properly closed in 1970 or even in 1978 the unfortunate "waste slide" of 1980 may never have occurred.

Appellant argues that DER is somehow estopped by virtue of the contract between the DER Division of Stream Improvement and appellant from insisting upon compliance with the Solid Waste Management Act. We disagree. Not only would this be

bad public policy, chilling the desireable cooperation between levels of government faced with a common problem, we also hold that on this affirmative defense appellant has the burden of proof. Appellant failed to point out any provision of the aforesaid contract which in any manner limits the authority DER exercises in the instant order and thus failed to shoulder its burden of proof.

Appellant also argues that pursuant to §11(a) of the SWMA, 35 P.S. §6011(a), DER may only issue an order against a municipality if it makes certain findings and appellant asserts that DER failed to make these findings.[2] Appellant apparently ignores the fact that there is no such procedural precondition to §6(9) of the SWMA 35 P.S. §6006(9), the section of that act under which the order in question was issued. Note that in City of York, et al v. Comm., DER, 26 Pa. Commw. 603, 364 A. 2d 978 (1976), orders issued to municipalities under §6(9) were upheld without any such showings. Moreover, DER did make findings in its order that contents of appellant's solid waste disposal site entered waters of the Commonwealth and this is nuisance per se under Section 307 of the Pennsylvania Clean Streams Law, the Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. §691.307.

---

2. The Solid Waste Management Act in effect on the date the instant order was issued was repealed by a new Pennsylvania Solid Waste Management Act, Act 97, July 7, 1980, P.L. 380 P.S. 35 §6018.101 et seq. but note in the current pocket part of Purdon's at page 35 a Savings Clause which specifically states that orders issued under the old Solid Waste Management Act remain in full force and effect. For what its worth, the new act, in §§104(7) and (13), continues to supply DER with the authority to issue the order in question without making a finding of nuisance as a condition precedent.

Appellant finally argues that it has been unconstitutionally deprived of its property by the limitation of access provision of the order. In the first place, municipalities, as creatures of the state, simply have no due process rights vis á vis the Commonwealth of Pennsylvania. DER v. Borough of Carlisle, 16 Pa. Commw. 341, 330 A. 2d 293 (1974). In addition, the clear import of the access limitation portion of the order is to ensure that the site will stay closed "as a solid waste site." Once the remedial activities contemplated by the order have been completed, nothing therein prevents appellant from utilizing its site in any other lawful manner.

Finally, with regard to the scrap pile described above, while it may be true that 25 Pa. Code § 75.28(h) permits the storage of scrap metal under conditions intended to prevent vector and rodent harborage, the scrap metal on appellant's site is not stored in this manner and, in addition, appellant has failed to demonstrate, as required by 25 Pa. Code § 75.28(h), that it has a market for said scrap.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and the subject matter of this appeal.

2. Lake City Borough has operated the solid waste disposal facility from at least April 20, 1970 until August 8, 1980 without a permit in violation of the Solid Waste Management Act.

3. Lake City Borough has not properly closed the site in compliance with the regulations.

4. Elk Creek is a water of the Commonwealth as defined in The Clean Streams Law.

5. The entry of the solid wastes into the waters of the Commonwealth on July 17, 1980 constituted pollution of said waters of the Commonwealth.

6. The order under appeal was a reasonable exercise of the department's enforcement powers.

## ORDER

And now, July 15, 1983, appellant's appeal is dismissed and DER's order is sustained.