East Pennsboro Township Authority and East Pennsboro Township, Appellants, *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Appellee.

Argued January 6, 1975, before President Judge BOW-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Jerry R. Duffie,* with him *Myers, Myers, Flower & Johnson,* for appellants.

*Eugene E. Dice,* Assistant Attorney General, for appellee.

OPINION BY JUDGE KRAMER, March 20, 1975:

This is an appeal filed by East Pennsboro Township Authority and East Pennsboro Township (Pennsboro) from an order of the Environmental Hearing Board (Board), dated March 8, 1974,[1] which modified an order of the Department of Environmental Resources (DER) dated August 24, 1973, which latter order had totally prohibited any additional discharges to or connections with the sanitary sewer system of Pennsboro known as South Plant, without written authorization of DER. This type of prohibition is commonly called a sewer ban. The Board's modification of DER's sewer ban permitted the issuance of no more than three permits per month for dwelling units which will require connection to the South Plant system.

On or about October 6, 1958, the Sanitary Water Board[2] issued Sewage Permit No. 9132-S which approved an application by Pennsboro for the construction and operation of a sanitary sewer system. Although the permit does not specifically set forth the design capacity of Pennsboro's South Plant, the record indicates that the

---

1. On March 29, 1974, the Board granted DER's motion for reargument, but the parties have stipulated that all of the substantive issues presented at the reargument granted were wholly unrelated to any of the issues presented by the appeal in this case. While the record before us might lead one to believe that the matter is not ripe for appeal, we have proceeded, based upon the stipulation of the parties, to bring the issues presented in this appeal to a final determination.

2. Predecessor to the Department of Environmental Resources. *See* section 1901-A (21) of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §510-1 (21) (Supp. 1974-1975).

plans and specifications attached to and referred to by the permit set forth a requirement that the design capacity of this primary treatment plant under said permit was to be 1.15 million gallons per day. The regulations established by the Environmental Quality Board (EQB) require a primary treatment plant such as South Plant to remove at least 35% of the organic pollution load. *See* 25 Pa. Code §97.42.

Because of a proposed apartment development in Pennsboro, DER conducted an investigation and determined that the South Plant was receiving a waste load in excess of its design capacity. DER concluded that by virtue of this overload (referred to in the record as hydraulic overload) Pennsboro was polluting the waters of the Commonwealth. Based on its investigation and without hearing, DER issued its August 24, 1973 order which prohibited Pennsboro from making any additional connections to the sanitary sewer system of its South Plant without written authorization from DER. The order specifically exempted sewage discharges to be generated as a result of new construction for which building permits had been issued prior to August 24, 1973.

Pennsboro filed an appeal with the Board and a hearing was held. The Board thereafter issued its adjudication in which it found, among other things, that South Plant was hydraulically overloaded in that the daily influent frequently exceeded the design capacity but that the most recent available data (November 1972 through July 1973) indicated that the BOD (biochemical oxygen demand) removal was consistently within the permit requirement of 35%. The Board concluded that the South Plant is frequently operated with a hydraulic load in excess of its design capacity, but that it is not presently violating the 35% BOD removal requirement.[3] The rec-

---

3. The latest available data indicates that the South Plant's average BOD removal is well in excess of the 35% requirement even though the plant fails to meet the requirement on some days.

ord indicates that during the period 1960 through 1971 the plant operated at less than its design capacity but that during the period of 1972 through September of 1973, the design capacity was exceeded on more than a majority of the days of operation. At times the volume went as high as 2.8 million gallons per day. It would appear that while the plans and specifications in 1958 estimated a design capacity of 1.15 million gallons per day, the actual operating capacity of this plant far exceeded that figure. In addition the record indicates that additional equipment was added to the system (e.g. chlorine contact facilities) which had increased the efficiency of the South Plant system.[4]

In its appeal to this Court, Pennsboro contends that the Board erred in partially upholding the sewer ban because DER failed to establish that the South Plant was causing pollution or operating in violation of its permit. Pennsboro also contends that DER erred by not considering the economic impact of its sewer ban and that the Board acted arbitrarily and capriciously by limiting the monthly number of new connections to three.

Our scope of review of Board decisions is limited to a determination of whether constitutional rights were vio-

---

4. There is testimony in this record to support a finding that an input in excess of design capacity *may* adversely effect the treatment efficiency of the South Plant. Therefore, we believe DER was justified in its initial action not only because Pennsboro was violating its permit but also because Pennsboro was creating a danger of pollution. We note, however, that the data contained in this record indicates little if any correlation between the hydaulic overload of South Plant and its efficiency. For instance in 1972 the South Plant failed to meet its 35% BOD removal requirement during a dry period when it was operating well within its design capacity, but did meet the requirement during a wet period when it was operating above its design capacity. DER's expert testified that this could be due to a dilution effect that relatively clean ground water might have on the sewage system. In any event, these facts contained in this record seem contrary to the position of DER that hydraulic overload automatically causes pollution.

lated, an error of law was committed, or any necessary finding of fact was not supported by substantial evidence. *Department of Environmental Resources v. Leon E. Kocher Coal Company,* 9 Pa. Commonwealth Ct. 110, 305 A. 2d 784 (1973).

Section 3 of The Clean Streams Law (Act), Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.3 (Supp. 1974-1975), sets forth the following legislative declaration:

"The discharge of sewage or industrial waste or any substance into the waters of this Commonwealth, which causes or contributes to pollution as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance."

Section 202 of the Act, 35 P.S. §691.202 (Supp. 1974-1975), reads in pertinent part as follows:

"A discharge of sewage without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the board is hereby declared to be a nuisance."

Section 610 of the Act, 35 P.S. §691.610 (Supp. 1974-1975), gives DER the authority to issue orders of enforcement. That section reads, in pertinent part, as follows:

"The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act. Such orders shall include, but not be limited to, orders modifying, suspending or revoking permits and orders requiring persons or municipalities to cease operations of an establishment which, in the course of its operation, has a discharge which is in violation of any provision of this act. Such an order may be issued if the department finds that a condition existing in or on the operation involved is causing *or is creating a danger of pollution* of the waters of the

*Commonwealth*, or if it finds that the permittee, or any person or municipality *is in violation of any relevant provision of this act, or of any relevant rule, regulation or order of the board or relevant order of the department. . . ."* (Emphasis added.)

The record in this case establishes beyond cavil that since 1972 the South Plant of Pennsboro has been operated regularly in excess of the design capacity as set forth in the plans and specifications attached to and referred to in the 1958 permit. Discharges contrary to the terms and conditions of a permit are declared to be a nuisance by section 202 of the Act, quoted above, and we believe DER had a duty to attempt to bring South Plant into compliance with its permit.

We glean from a reading of all of the applicable DER regulations and the statute that if the operator of a sewage system under a permit desires to increase the approved design capacity in excess of that provided in the plans and specifications attached to its permit, the burden is on the sewer operator to obtain an amendment to its permit or obtain a new permit. A sewage treatment plant must comply with each provision or condition of its permit. If it does not and DER establishes that the plant is operating in violation of its permit, it is appropriate for DER to take enforcement action to ensure that the permit requirements are followed.

Pennsboro argues that DER did not take the economic impact of its sewer ban into account and thereby abused its discretion. Section 5 of the Act, 35 P.S. §691.5 (Supp. 1974-1975), provides, in pertinent part:

"(a) The board and the department, in adopting rules and regulations, in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act, consider, where applicable, the following:

"(1) Water quality management and pollution control in the watershed as a whole;

"(2) The present and possible future uses of particular waters;

"(3) The feasibility of combined or joint treatment facilities;

"(4) The state of scientific and technological knowledge;

"(5) *The immediate and long-range economic impact upon the Commonwealth and its citizens.*" (Footnote omitted.) (Emphasis added.)

Pennsboro relies heavily upon our statement in *Bortz Coal Company v. Commonwealth,* 2 Pa. Commonwealth Ct. 441, 279 A. 2d 388 (1971) where we ordered the Air Pollution Commission to take into account the economic impact of closing down beehive coke ovens, in determining the timetable for such shutdown. The *Bortz* case was interpreting the law prior to the reorganization of the formerly separate environmental agencies into the Department of Environmental Resources,[5] but we believe the principle set forth in *Bortz* is still valid.

Under the existing administrative law scheme for regulating environmental problems, there are now three separate and distinct regulatory bodies. First, there is the Environmental Quality Board (EQB), which is intended to establish rules and regulations governing environmental matters. We presume that the EQB considers the factors set forth in section 5 of the Act, 35 P.S. §691.5 (Supp. 1974-1975), including economic impact, when it formulates and adopts regulations. It is impossible, however, to predict in advance all of the possible problems which might arise under a regulation and, therefore, section 5 requires DER and the Board to give ongoing consideration to the factors set forth there, as they enforce the regulations.

---

5. *See* Act of December 3, 1970, P.L. 834, amending the Administrative Code of 1929, 71 P.S. §51 et seq.

The second agency procedurally involved is DER. Once the EQB has established the regulations, DER has the duty of enforcing them. As we perceive the regulatory scheme, if the EQB has established a regulation whereby a specific requirement or prohibition is set forth, such as the 35% removal of waste material by a primary sewage plant, then DER is under an obligation to enforce such regulation literally. Section 1921-A of the Administrative Code of 1929, P.S. §510-21 (Supp. 1974-1975), provides that DER may take such initial action as it deems necessary for enforcement of any statute or regulation without a hearing, but that no such action shall be final as to persons adversely affected until they have had an opportunity to appeal to the Board. DER in this and other cases has taken the position that it has no discretion to consider such things as economic impact based upon its reasoning that the EQB has already done so. We disagree. We read section 5 of the Act, quoted above, to require DER to give consideration to economic impact as it enforces the regulations. We do not believe that DER is required to make a detailed economic impact study before issuing an order, but we do believe it is highly improper for DER to issue an order without giving any consideration whatsover to economic impact. DER must consider such adverse economic impact as can reasonably be foreseen or determined at the time it issues its order. The only time that DER may ignore economic impact is when it is dealing with a mandatory provision of the Act or a regulation which does not give DER any discretion. *See Rochez Bros., Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources,* —— Pa. Commonwealth Ct. ——, 334 A. 2d 790 (1975). In the instant case DER admits it gave no consideration to the economic impact of its sewer ban. We hold this to be error. Under the facts of this case, DER had discretionary power to issue a complete sewer ban, to permit limited connections or to issue and order to enforce or even

coerce compliance. We believe, however, that DER's refusal to consider economic impact was a harmless error. In other words we do not believe that a proper consideration of economic impact by DER would necessarily have required a different result. In any event the Board did consider economic impact in making its adjudication, and it is the Board's adjudication which we are reviewing.

The third agency involved procedurally is the Board. The Legislature, in its wisdom, provided an independent hearing board for the purpose of reviewing the actions of DER and the regulations established by EQB. All appeals to the Board are subject to the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended,* 71 P.S. §1710.1 et seq. Under the procedural scheme, any party may challenge the action of DER or the legality of any regulation established by EQB. The Board must provide all of the procedural due process rights as set forth in the Administrative Agency Law. It must then issue its adjudication, including findings of fact and conclusions of law, based upon a record made. Finally in the procedural scheme, an appeal may be taken from the Board to this Court under the scope of review noted above.

Recently we had occasion to pass upon a case where the substantive issues were similar to those involved in this case. In *Commonwealth of Pennsylvania, Department of Environmental Resources v. Borough of Carlisle,* 16 Pa. Commonwealth Ct. 341, 330 A. 2d 293 (1974), we had another sewer authority involved in this very same watershed. The record there revealed that the sewer plant had exceeded its design limits, and the BOD removal violated the percentage removal requirements. We there concluded that a finding of hydraulic overload accompanied by evidence of insufficient percentage reduction of wastes was sufficient to justify a sewer ban. As in this case, the Board in *Carlisle* modified DER's ban by permitting limited additional sewer connections. We there held that evi-

dence presented by the sewer authority through local developers and realtors was sufficient to support the Board's modification. We concluded that the Board had taken economic impact into consideration, and that therefore the Board's adjudication met the requirements of the Act. We stated in *Carlisle* that:

"Where it is found necessary to meet the objective of the act the DER may issue appropriate orders including orders to prohibit additional sewer connections."

16 Pa. Commonwealth Ct. at 349, 330 A. 2d at 298. Our holding in *Carlisle* is controlling in this case. It is quite clear that one objective of the Act is to require that all sewage discharges be in accordance with the terms and conditions of a permit.

Our careful review of the entire record in this case permits us to conclude that all of the findings of fact made by the Board are supported by substantial evidence. The Board's conclusions of law are likewise correct and must be affirmed. A review of the Board's adjudication permits us to conclude that it did not abuse its discretion in modifying the DER order by permitting the addition of three permits per month onto the South Plant sewer system. Whether this Court agrees with the Board's conclusion that only three additional connections should be made to the South Plant system is of no real moment. We have been instructed by our Supreme Court that in the absence of a purely arbitrary exercise of an agency's duties or functions, judicial discretion may not be substituted for administrative discretion. We are told that our review is particularly restrictive where an administrative agency resolves complex questions of technology. *See Commonwealth v. Harmar Coal Company*, 452 Pa. 77, 306 A. 2d 308 (1973).

We note that the order of the Board seems to indicate that if Pennsboro can obtain an amendment to its permit or a new permit, which would increase the design capacity, the permitted number of connections could be

increased. This seems to be a logical solution to Penns-boro Township's desire for further real estate development. To hold otherwise would make the regulation applicable to sewer permits meaningless. Our reading of the Act leads us to the conclusion that the Legislature intended to control effluent discharges into the waters of the Commonwealth through a system of permits. These permits were intended to be meaningful. If the operators of sewage systems are permitted to obtain a permit based upon certain representations through plans and specifications, and after receiving the permit are thereafter permitted to do as they see fit, then the control of the effluent would be lost. If the operator of a sewage system desires to increase its capacity, influent or effluent, the regulations provide a system for obtaining new or amended permits. We cannot permit the circumvention of the law based upon the theory that violation of a permit is permissible as long as DER fails to prove that the violation is actually causing pollution.

We therefore

ORDER

AND NOW, this 20th day of March, 1975, the order of the Environmental Hearing Board dated March 8, 1974, filed in the above-noted matter, is hereby affirmed.