## Porter v. Commonwealth

*Deake G. Porter*, appellant, p.p.
*Terry R. Bossert*, for Commonwealth.

WATERS, *Chairman*, July 31, 1975 — This matter comes before the board as an appeal from the approval by the Department of Environmental Resources (hereinafter "DER") given to the Columbia County Solid Waste Authority (hereinafter "authority") to open and operate a landfill in Mt. Pleasant Township. Appellants, Deake G. Porter and Clara Vanderslice, are citizens of the county who oppose the landfill not only for environmental reasons, over which we have jurisdiction, but for a myriad of reasons over which this board has no control. A supersedeas was requested early in this lengthy proceeding, and was denied for reasons outlined hereinafter.

## FINDINGS OF FACT

1. Permit No. 100924 for construction of a solid waste disposal facility was issued to the authority on June 15, 1973, by DER in response to a detailed application including required phase I and II module submissions.

2. The landfill authorized pursuant to that permit was inspected by DER on August 16, 1974, and approved for operation which began on August 19, 1974.

3. The inspection revealed that the leachate collection pipe was connected to the holding tanks and that an agreement had been entered into with the Bloomsburg Sewer Authority to treat the leachate and that a pump was present on the site for recirculating the leachate.

4. DER approved the use of two 1,000-gallon asphalt lined concrete holding tanks as an interim leachate collection facility instead of the original ponds called for in the application.

5. The contract with the Bloomsburg Authority was never carried out because of capacity limitations of the plant.

6. The authority is presently recycling the liquid accumulation coming from the landfill, although no substantial amount of leachate was expected in the beginning months of operation.

7. After the plans were approved, the authority made many alterations in the construction and intended operation plans, some of these were approved by DER but it appears that some did not receive prior approval.

8. The single most important change was made as to the type of liner which was to be used to cover the landfill site before any refuse cells were deposited. Although not the subject of testimony, we

infer that either DER, the authority, or both, did not deem it safe to rely upon the soil alone to protect the waters of the Commonwealth from degradation.

9. The uncertainty which seems to have permeated this operation from the very beginning, was accentuated by a last minute change in liner material, from an asphalt membrane over a sand base to an asphalt cement spray known as AC-20,[1] made on the very day it was to be put in place.

10. The authority made extensive efforts to obtain a site for solid waste disposal which would meet the requirement of DER.

## DISCUSSION

This controversy has called forth the very best efforts in temperament, patience, legal skill and perception. The long, drawn-out hearings covering many months and hundreds of pages of testimony, brought personal attacks and aspersions cast upon the hearing examiner, his integrity and knowledge of the law, by one not an officer of the court, having been admitted to practice law before no bar in this State. The clearest difference we have in this matter with appellants is our honest belief that no matter what decisions we make, we could be in error. This is a possibility never once considered by them, as they denied their own fallibility, by assuming that any disagreement with their position arose from corrupt motives.

1. What we have referred to as a liner is a subbase with a small amount of AC-20 and two inches of concrete base known as amiesite, sprayed with hot asphalt material at the amount of 1½ gallons per square yard, which hardens into an impervious area over the landfill site. On top of this, the refuse is then placed in bulk loads, compacted by a large piece of machinery and then a layer of earth placed on top of it again compacted before another "cell" of refuse is placed on top of that.

The Solid Waste Management Act of July 31, 1968, P.L. 788 (No. 241), has as its primary purpose to bring control to the activity of collecting and disposing of refuse throughout the Commonwealth. Because of the nature of solid waste and its long-range ability in landfills to create a by-product known as leachate, which is a pollutant, The Clean Streams Law, Act of June 22, 1937, P.L. 1987, as amended, 35 PS §691.1, et seq., must be read in conjunction with it, to resolve the many issues raised by this appeal. In addition, the Constitution of Pennsylvania, article I, sec. 27, now provides:

"The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of the people."

This is the legal basis upon which the appeal must sit if it is to be successful. Much of the "testimony" which was offered, and I use the term loosely, was totally unrelated to the above-indicated provisions as we are given to understand them. We consistently rejected statements regarding the cost of the landfill and the outrage thereby caused to the taxpayers. It is true that the Solid Waste Management Act, supra, refers to the "economic loss"[2] as one item which the act was

----

2. Solid Waste Management Act of July 31, 1968, P.L. 788, 35 PS §6002:

"It is hereby determined and declared as a matter of legislative finding that, since improper and inadequate solid waste practices create public health hazards, environmental pollution and *economic loss*, it is the purpose of this act to:

intended to prevent. Although there is some question as to whether this language refers to the cost to taxpayers in obtaining a landfill, as opposed to loss due to disposal methods used where there is no permitted solid waste system, we believe that issue to be outside our jurisdiction. DER is not authorized to refuse the grant of a permit based on the cost of the project. The only State funds authorized in the act are to be used for planning, and not the purchase or maintenance of a solid waste disposal area.[3] This leads us to the conclusion that, inasmuch as DER has no authorization to grant or refuse a permit based on the cost involved, which it does not pay in any event, this board cannot review actions of DER based on that consideration. This is not to say that honest, hard-working tax-paying citizens have no remedy when unscrupulous public officials fraudulently divert funds as alleged by appellants in this case. Clearly, they do have a remedy, criminally by bringing the information to the

"(1) Establish and maintain a cooperative state and local program of planning and technical and financial assistance for comprehensive solid waste management;

"(2) Utilize, whenever feasible and desirable, the capabilities of private enterprise in accomplishing the desired objectives of an effective solid waste management program; and

"(3) Require permits for the operation of processing and disposal systems." (emphasis supplied).

3. Solid Waste Management Act of July 31, 1968, P.L. 788, 35 PS §6012(a):

"(a) The department is authorized to assist counties, municipalities, and authorities by administering grants to pay up to fifty percent of the costs of preparing official plans for solid waste management systems in accordance with the requirements of this act and the rules, regulations and standards adopted pursuant to this act, and for carrying out related studies, surveys, investigations, inquiries, research and analyses."

attention of the district attorney and the Justice Department, civilly, by actions to recover public funds and, finally, the very cornerstone of our system of government, the ballot, can be used to remove from office those unfit to serve. We say all of this having said it many times before during the hearing, only because, for some reason, appellants could not, or would not, believe it when orally communicated. Perhaps the written word will help. In any event, it will clearly permit a review of these legal conclusions on appeal.

DER has consistently maintained that the board has no jurisdiction in this case because there was no appeal from the issuance of the permit within 30 days of the June 15, 1973, date. Undoubtedly that would have been an appealable action. The authority, however, was notified by DER that the landfill for which the permit had been issued could not begin operation unless and until DER made a final inspection and consented to the operation. It would take a very narrow construction, indeed, of the review power of this board, to hold that when the representatives of DER went to the site, made a final inspection and authorized the landfill to begin operation on August 16, 1974, that they took no "action" reviewable by this board.

---

4. Appellant argues that the board has jurisdiction over fraud cases because DER has cited a case indicating that a late appeal can be accepted as timely by the board in the event that fraud prevented its timely filing. Of course, only the latter is good law, but it shows vividly the truth of the old saying that "a little knowledge is a dangerous thing." This lack of understanding of the rules of law and their many exceptions caused this hearing to take much longer because the examiner, at every opportunity, tried to briefly explain the legal implications of various aspects of the case, only to be charged with bad intentions by those he sought to help.

The next, and more difficult question is: What is the scope of the review based on the appeal filed on September 6, 1974? DER, again taking the most conservative approach, argues that we are limited to consideration of only those matters which occurred prior to the August 16, 1974, action. We do not agree. This board has on numerous occasions allowed DER to present testimony as to events occurring at a time after their action under attack, when that information would support their original decision. See Joseph Rostosky d/b/a Joseph Rostosky Coal Co. v. Commonwealth of Pennsylvania, Department of Environmental Resources, EHB docket no. 73-178-C (issued June 26, 1974). The Commonwealth Court has recently affirmed this procedure by saying:

"In cases such as this, we are not required to review an administrative decision by DER which was rendered without a due process hearing, because as we view the Administrative Agency Law and section 1921-A of the Code, when an appeal is taken from DER to the Board, the Board is required to conduct a hearing de novo in accordance with the provisions of the Administrative Agency Law. In cases such as this, the Board is not an appellate body with a limited scope of review attempting to determine if DER's action can be supported by the evidence received at DER's fact finding hearing. The Board's duty is to determine if DER's action can be sustained or supported by the evidence taken by the Board. If DER acts pursuant to a mandatory provision of a statute or regulation, then the only question before the Board is whether to uphold or vacate DER's action. If, however, DER acts with discretionary authority, then the Board, based upon the record made before it, may substitute its discre-

tion for that of DER. See East Pennsboro Township Authority v. Commonwealth of Pennsylvania, Department of Environmental Resources, 18 Pa. Commonwealth Ct. 58, 334 A. 2d 798 (1975) and Rochez Bros., Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources, 18 Pa. Commonwealth Ct. 137, 334 A. 2d 790 (1975). DER's authority to attach terms and conditions to the permit in the instant case was obviously discretionary and, therefore, the Board could properly substitute its discretion concerning the terms and conditions for that of DER. ...": Warren Sand & Gravel Co., Inc. et al v. Department of Environmental Resources, C. D. 1974, 734, 735.

In this case, we perceive no reason to treat the parties any differently than the proverbial goose and gander. We extended a broad scope hearing to appellants in line with the above decision with the belief that, if it were shown that the landfill should not have been authorized to open, or if conditions should now be added to limit that authorization, this board is properly called upon to take corrective action. It goes without saying that there must, nevertheless, be some logical end to this reviewing process.[5] The board must not slip from adjudication into administration. It is the authority and not DER or this board which must finally operate the landfill.

One other procedural matter deserves comment

---

5. Appellant Porter filed a document on April 18, 1975, entitled "A New Appeal against Operation of a Landfill in Continuing Violation of the Solid Waste Management Act and The Pennsylvania Code, or Brief in Support of a Petition for Supersedeas." We have received and docketed this as a post-hearing brief only, the time for any new appeals from DER action having long since elapsed.

before we further discuss the substantive issues of this appeal. Appellants filed a notice of appeal making many allegations. No answer was filed by either DER or the authority and appellants argue that this is a clear violation of Pa. Code Title 25, §21.18, the board's own procedural rules. The language relied upon requires that an answer be filed to "a complaint, new matter, petitions or motions." There are two problems with appellants' argument. First, the notice of appeal is not included in any of the named pleadings. Secondly, as to the supersedeas, which is a petition, the burden of proof would remain upon appellants in any event if the simple device of denying all allegations, was resorted to by DER and/or the authority. Any allegations made, in which either adverse party concurred, could and presumably would have been stipulated to on any number of the occasions on which they specifically refused to do so. In short, there has been no prejudice to appellants, and these procedural rules are designed, after all, only to insure fairness and order in board proceedings.

The major issues raised by this appeal[6] based on

6. The unstated but underlying factor in this proceeding is the same as identified by the court in Application of Borough of Carlisle for Approval to Operate Solid Waste Incinerator Plant, 25 Cumberland 16:

"There is also associated with these concerns a sort of intangible feeling that makes acceptance difficult. One witness for the objectors gave it a name: 'Adverse negative psychological effect on the neighborhood.' In Wood v. Town of Wilton, 240 A. 2d 904, where there was an action for an injunction to restrain the town from using land for a dump, the trial courts, in granting the injunction, '(c)oncluded that the spector of a "town dump" blights the area with a "black psychological overcast" which has a depressing and deprecating effect on the plaintiffs' properties.' After taking account of the trial court's finding as quoted above, the Supreme Court of Connecticut

the length of time devoted to them by appellants, are the plan revisions and the method by which they were accomplished. The Solid Waste Management Act of July 31, 1968, P.L. 788, 35 PS §6007(d), requires:

"(d) Plans, designs and relevant data for the construction or alteration of solid waste processing and disposal facilities and the location of solid waste processing and disposal areas shall be prepared by a registered professional engineer and shall be submitted to the department for approval prior to the construction, alteration or operation of such facility or area except when food process wastes are used for agricultural purposes in a manner which will not create a public health hazard or pollution of the air or water."

Much has been made of the fact that there was no actual physical mark showing written approval by DER of the permit application which was submitted and contained phase II module plans and specifications for the landfill. It is true that formal written approval on the application itself would be an easily understandable method of carrying out the program. The question, however, is whether that is the only acceptable way in which to proceed. We think not. When a permit is issued, as it was

said: '(T)he finding discloses that this fear of a "town dump," although real, has no basis of fact.' The court then went on to say that the anticipation by the plaintiffs of the possible consequences of the defendant's proposed use of the property can be characterized as a speculative and intangible fear. The appellate court found instead that the disposal area for garbage involved in this suit was not a garbage dump as such expression is usually used, but is a sanitary landfill garbage disposal operation. The trial court was reversed and the town's proposed landfill was not enjoined."

here, on June 15, 1973, any question about the action taken by DER as to the application submitted by the authority would clearly be resolved. This would seem to be a statement of the obvious.

There was convincing evidence as well as admissions that the plans set forth in the original application, of which the phase II module was a part, were changed significantly on a number of occasions. Appellants dramatically demonstrated a number of these revisions and some inconsistencies between what was called for in the plans and what actually was done at the site.[7] This raises what I believe to be the key question which ran throughout this entire proceeding. The act specifically authorizes DER to revoke or suspend any permit where the disposal facility is in violation of the act or department regulations.[8] It is clear from the language of

---

7. Among the many items:

(a) The access road did not in all respects measure up to the requirements of the plans and regulations.

(b) The refuse cells were often placed improperly.

(c) The type of liner was changed at the last minute, when the intended material was not available.

(d) The stock piles used for cover material were poorly utilized.

(e) A temporary recycling of leachate was embarked upon, rather than the original treatment plans.

(f) The retaining walls (head walls) around drain pipe were not properly maintained.

8. The Solid Waste Management Act of July 31, 1968, P.L. 788 (No. 241) 1968, as amended, 35 PS §6007(e), provides:

"(e) Any permit granted by the department, as provided in this act, shall be revocable or subject to suspension at any time the department shall determine that the solid waste processing or disposal facility or area (i) is, or has been conducted in violation of this act of the rules, regulations, or standards adopted pursuant to the act, or (ii) is creating a public nuisance, or (iii) is creating a health hazard, or (iv) adversely affects the environment or economic development of the area."

the act that this power is not mandatory but discretionary. The question then becomes, whether it is an abuse of discretion for DER to fail to suspend or revoke a permit when actual violations of the act occur. The only logical answer to this question is, that it all depends on the "violation" in question. If the legislature intended every and any violation, regardless of magnitude, to call forth a suspension—or worse—it would have said so. It would not have left the matter in the hands of DER to decide. The permit, where violations occur, is merely "subject to suspension" or "revocable" i.e., subject to be revoked. It seems to us that the nature and extent of alleged violations must be the criteria for determining whether and when the above power is to be exercised.

The final logical step which appellants are bound to take if they would complete the showing needed to move this board to finding an abuse of discretion is proof of some clear danger or actual harm to citizens or the environment. It is here where appellants' evidence falls short. At this crucial point, we are urged[9] to accept suspicions, fears, vague unsubstantiated possibilities and good intentions in place of the missing facts.

The writer visited the site of this landfill, and

9. Perhaps the word "badgered" would be more appropriate. Appellants' brief states:

"Porter is certain that, even if he had not proven that this Landfill has created hazards to health and pollution, and threatens much greater hazards and pollution in the future, the overwhelming evidence that DER officials have engaged in a conspiracy with appellee Authority to allow contractors to steal hundreds of thousands of dollars under color of complying with Act 241 and Chapter 75 rules, required this Board to revoke this Landfill's Permit, if this Board had any wish to continue to pretend it has any interest in upholding Act 241."

found that.Fishing Creek, a body of water which runs in close proximity to the landfill, does appear to justify some long-range concern. The landfill sits on a lovely hill overlooking the scenic creek site. The asphalt liner (AC-20) used to line the landfill is intended to last indefinitely, and the expert witnesses all agreed that any underground water supply would not be harmed so long as the liner did the job for which it was put in place. Still, this is not a procedure with any proven long-range on-site efficiency record. We would expect that all of the laboratory tests would be favorable, but they are still only tests, and candor dictates that we call the installation of the liner at the landfill itself a test. The slope of the land, pieces of liner that clearly did not remain in the ground[10] and appearance around the edge of the liner of an unsightly seepage all lead me to a more cautious appraisal. The uncertainty of just what the future holds with regard to disposition of the leachate that is collected, and the effectiveness of the recycling program have all given me pause. The general maintenance of the landfill and all of the uncertainty that seems to have been a part of this project from the beginning up until now causes us to require some continuing vigilance on the part of DER.

As a beginning point, there must be continuing periodic sampling of Fishing Creek before and after it passes the landfill site. We believe a monitoring program is clearly called for by the facts of this case. We suspect there may be no such thing as a perfect landfill, and we do not reach for that utopia here. We do, however, believe that valuable information can be gained from the liner installation so

---

10. Large pieces of the liner were presented as exhibits by appellants and respondents claim this was all "excess" a defense easily made, but hard to prove.

that future decisions on the use thereof in Pennsylvania can be made more intelligently and, of course, more importantly, so that any problem which develops at the site of this landfill are detected at an early date so that any needed corrective measures can be taken.

There were a number of issues raised which deserve only brief final comment, and others which we feel deserved none at all. Appellants consistently argued on behalf of the haulers and alluded to their dissatisfaction but, curiously, none of them appeared as witnesses. We are free, under the law, to draw certain conclusions from their absence, and we did. Apparently there are a number of other actions pending, both civil and criminal, which are related in some way to this proceeding. This information came to our attention by various devices at the hearing and we merely repeat the irrelevancy as then stated. Appellants argue that if there is an enforcement unit in DER, this case should be handled by it. The mandamus or equity actions needed to accomplish the results sought can be brought by the secretary pursuant to the Solid Waste Management Act of July 31, 1968, 35 PS §6005(i) or §6013, but DER alone, must decide whether it wants to institute such enforcement actions.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and subject matter of this appeal.

2. DER properly issued a solid waste management permit to the authority on June 15, 1973.

3. The grant of permission by DER for the authority to begin operation on August 16, 1974, was an appealable action of DER.

4. The failure of the authority to comply in exact detail with every letter of the Solid Waste Management Act, supra, and the department's regulations

promulgated thereunder, does not automatically require a suspension or revocation of a permit by DER.

5. DER did not abuse its discretion by allowing the authority to begin operation on August 16, 1974, and no evidence presented at the hearing before this board would require a revocation or suspension of the permit.

6. There is enough uncertainty in the new liner process being used by the authority in close proximity to substantial waters of the Commonwealth, to require continuous monitoring by both the authority and DER in line with a detailed and specific program to determine the efficacy of the liner.

### ORDER

And now, July 31, 1975, the grant of Permit No. 100924 to the Columbia County Solid Waste Authority is hereby sustained. The matter is, nevertheless, remanded to the Department of Environmental Resources for the purpose of requiring the authority to implement, within 90 days, a specific long-term monitoring and testing program as to the liner itself and its effect, if any, on the waters of the Commonwealth.