Commonwealth of Pennsylvania, Department of Environmental Resources, Appellant, *v.* Borough of Carlisle and Carlisle Borough Sanitary Sewer Authority, Appellees.

Borough of Carlisle and Carlisle Borough Sewer System Authority, Appellants, *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Appellee.

Argued September 5, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Dennis J. Harnish,* Special Assistant Attorney General, for Commonwealth.

*William F. Martson,* with him *Martson and Snelbaker,* for Borough of Carlisle.

*John B. Fowler, III,* with him *Garber, Fowler & Addams,* for Carlisle Borough Sanitary Sewer Authority.

OPINION BY JUDGE BLATT, December 27, 1974:

This action involves an appeal by the Department of Environmental Resources (DER) and cross-appeals by the Borough of Carlisle and the Carlisle Borough Sewer System Authority (cross-appellants) from an adjudication of the Environmental Hearing Board (EHB) restricting new connections to the sewage system of the Borough of Carlisle.

As early as April of 1971 the DER had ordered the Carlisle Sewer Authority to upgrade the sewage treatment facilities on LeTort Spring Run so as to meet new water quality criteria applicable to the entire Susquehanna River Basin. The Sewer Authority, in response, proposed to construct a new regional sewage treatment facility on the Conodoguinet Creek and to abandon the LeTort Spring Run facility. With this understanding, the parties established a timetable for construction, but, when the Sewer Authority seemed not to be cooperating, the DER instituted an enforcement proceeding in this Court. *Commonwealth of Pennsylvania v. Carlisle Borough Sewer System Authority* (No. 291 C.D. 1973, instituted March 9, 1973). On April 17, 1973, that suit terminated by consent of the parties and a decree issued

from this Court setting forth a new construction time-table providing for the completion and operation of the new treatment facility by October 1, 1976.

Ten days after issuance of the consent decree, on April 27, 1973, the DER issued a second order. This order, issued without prior notice or hearing, prohibited "any additional discharge into the sanitary sewer system which is tributary to the [current] Carlisle Borough Sewer System Authority treatment facilities unless written authorization for the discharge has been granted by the Department or for new construction for which building permits were issued prior to the date of receipt of this Order." This, of course, affected the cross-appellants, who were here required to report on measures being taken by them to enforce this sewer ban and also on steps being taken by them to reduce infiltration in the sewage collection system. They filed a timely appeal to the EHB, which, after taking testimony at hearings, first on a supersedeas petition on May 25, 1973, and then on the merits on June 15, 1973 and July 17, 1973, issued an adjudication on November 21, 1973, modifying the order so as to allow no more than four new sewer connection permits to issue per month.[1] It is this adjudication which is now before us for review.

Our review of Environmental Hearing Board decisions is limited to a determination of whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were unsupported by substantial evidence. *Department of Environmental*

---

[1] The order reads: "AND Now, This 21st day of November, 1973, the Appeal on behalf of the Borough of Carlisle and Carlisle Borough Sewer Authority is hereby sustained. The Appellants shall issue permits for additional connections to their sewage system for new homes at a rate not greater than four (4) per month until such time as as a new treatment plant is put into operation but not later than October 1, 1976, unless other terms are agreed upon with the Department."

*Resources v. Leon E. Kocher Coal Co.,* 9 Pa. Commonwealth Ct. 110, 305 A. 2d 784 (1973).

The cross-appellants assert that the consent decree of April 17, 1973, effects an estoppel upon the DER from issuing the April 27 sewer ban, by reason of the doctrine of res judicata. It is true, of course, that a consent decree may operate as res judicata on future actions. *Cooper-Bessemer Co. v. Ambrosia Coal and Construction Co.,* 447 Pa. 521, 291 A. 2d 99 (1972). For res judicata to apply, however, "there must be a concurrence of four conditions: (1) Identity in the thing sued upon or for; (2) Identity of the cause of action; (3) Identity of persons and parties to the action; and (4) Identity of the quality or capacity of the parties suing or sued." *McCarthy v. Township of McCandless,* 7 Pa. Commonwealth Ct. 611, 617, 300 A. 2d 815, 820 (1973). In the case at hand, conditions "1" and "2" are clearly missing. The consent decree of April 17, 1973, resolved prosecution of a cause of action to ensure compliance with the DER's newly established water quality criteria for intrastate waters in the Susquehanna River Basin. That was an action concerning new regional requirements for new regional watershed management standards. The DER order of April 27, 1973, on the other hand, commenced prosecution of a cause of action to ensure compliance with sewage treatment facility design criteria as specified by the individual permit issued to the Carlisle Sewer Authority. This was an action concerning immediate violations of specific design criteria for an individual plant operation. No doubt these actions each concerned some overlapping subject matter, but, inasmuch as each proceeding involved compliance with different regulations, it cannot be said that the resolution of the one by consent decree must preclude action on the other by reason of the doctrine of res judicata.

The cross-appellants also challenge the manner in which the sewer ban order issued, i.e., without prior notice or hearing. They assert that the imposition of a sewer ban without such notice and hearing constitutes a denial of Fourteenth Amendment rights to the due process of law.

The procedures employed by the DER in this case clearly came within the provisions of Section 1921-A of The Administrative Code of 1929, Act of April 9, 1929, P. L. 177, *as amended,* 71 P.S. §510-21: "(e) Anything in any law to the contrary notwithstanding, any action of the Department of Environmental Resources may be taken initially without regard to the Administrative Agency Law, but no such action of the department adversely affecting any person shall be final as to such person until such person has had the opportunity to appeal such action to the Environmental Hearing Board. . . ."

Here, although the DER issued the sewer ban without the preliminary hearing normally afforded under the Administrative Agency Law, it did afford a subsequent hearing on appeal before the EHB.[2] In *Commonwealth v. Derry Township,* 10 Pa. Commonwealth Ct. 619, 314 A. 2d 874 (1973), we considered this procedure and upheld its constitutionality. We now sustain our position in *Derry* and offer further elaboration in the light of the circumstances of this particular case.

It has long been established that: "Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire,

---

[2] The opinion of the EHB agreed that notice and a hearing would be required prior to such DER action as occurred here, but that such procedures would apply prospectively only.

hold, and manage personal and real property. . . . The state, . . . at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeat the charter and destroy the corporation. . . . In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States." *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178-179 (1907) ; *accord Trenton v. New Jersey,* 262 U.S. 182 (1923).

The order by the DER in the instant case was nothing more than exercise of state power over its agency, the Borough of Carlisle, to regulate sewage treatment within the borough. And, as stated in *Hunter,* such action is unrestrained by any provision of the Constitution of the United States.

To say, however, that a municipality is not constitutionally entitled to a hearing is not to say that private property owners do not have that right. The statutory hearing provided before the EHB in environmental cases such as this is in fact for the protection of private citizens whose property is in some way being relinquished. *See Glen Alden Coal Company Case,* 350 Pa. 177, 38 A. 2d 37 (1944). And, of course, where such a hearing is granted, the affected municipality is entitled to notice and to an opportunity for participation. *Nelson v. Garland,* 123 Pa. Superior Ct. 257, 187 A. 316 (1936). The cross-appellants argue, of course, that property rights of private citizens of the Borough are unconsitutionally infringed upon by the DER procedures. We are not persuaded, however, that any infringement occurred in this case. The DER order in question merely restricted issuance of *new* sewer permits in which property owners now have no property

right whatever. More accurately, property owners may be said to possess a mere privilege of utilizing a sewage collection system of the municipality upon obtaining a permit which is issued under limited conditions.[3] In any event, the cross-appellants have no standing to assert what is an individual property owner's claim. *Ramey Borough v. Department of Environmental Resources,* 15 Pa. Commonwealth Ct. 601, 327 A. 2d 647 (1974). We must hold, therefore, that the procedure followed by the DER in accordance with Section 1921-A of The Administrative Code of 1929, 71 P.S. §510-21, is constitutionally valid and that the appeal before the EHB afforded the cross-appellants a proper statutory hearing.

The cross-appellants next argue that the EHB adjudication, which restricted the issuance of new sewage connection permits to four per month, lacked the support of substantial evidence and constituted an arbitrary and unreasonable abuse of discretion contrary to law. A thorough review of the record, however, will not support this contention. The objective of The Clean Streams Law is to prevent further pollution of Commonwealth waters as well as to restore polluted

---

[3] Among these conditions as set forth in 25 Pa. Code §§71.54, 71.55, is the power to deny a permit for "Failure of the proposed system to adequately protect the public health and prevent pollution." 25 Pa. Code §71.55(4).

The DER, pursuant to the authority of The Clean Streams Law, has in effect changed these conditions through an appropriate exercise of state power over its subdivision. Concerning the exercise of such state power the United States Supreme Court has said: "Although the inhabitants and property owners may, by such changes, suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right, by contract or otherwise, in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences." *Hunter, supra,* at 179.

waters to their once clean state. Section (3) of The Clean Streams Law, Act of June 22, 1937, P. L. 1987, *as amended,* 35 P.S. §691.4(3) (Supp. 1974-1975). Where it is found necessary to meet the objective of the act the DER may issue appropriate orders including orders to prohibit additional sewer connections. Section 5 of The Clean Streams Law, 35 P.S. §691.203(b) (Supp. 1974-1975). There is no doubt, of course, that the findings of fact necessary to support such orders must be based upon substantial evidence, but, as we have stated before, substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *A. P. Weaver and Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 284 A. 2d 515 (1971).

The initial thrust of the cross-appellants' argument on this issue is that the DER has not sufficiently justified a finding that the effluent from the Carlisle sewage treatment facility is polluting LeTort Spring Run.[4] The DER finding is, no doubt, based upon the conditions set by the sewage permit issued to the Carlisle Borough Sewer System Authority. This permit establishes fa-

---

[4] " 'Pollution' shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The board shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined." The Clean Streams Law, 35 P.S. §691.1 (Supp. 1974-1975).

cility design limits allowing a three million gallon average maximum daily sewage influent containing *no more* than 7,410 pounds of biochemical oxygen demand (BOD). From the influent the permit requires a *minimum* removal of 85% BOD during the period May through October and 75% BOD during November through April prior to discharge into the stream. The Sewer Authority records reveal that these design limits have been exceeded. Since November of 1971 the quantity of influent untreated sewage has exceeded the three million gallon maximim, and between May 1972 and October 1972 the plant removed only 81.6% of the BOD from that influent. It is true that between November 1972 and April 1973 the BOD removal fell to within the permitted limits at 75.4%; however, at the EHB hearings, the cross-appellants introduced evidence on analytical results of sewage treatment samples in June of 1973 showing that the plant failed to meet the 85% minimum reduction of BOD on all but one of seven consecutive days. From this evidence the Board found that the plant was polluting the LeTort stream, and the evidence clearly was adequate to support such a conclusion.

The cross-appellants assert as a matter of law that these sewage permit violations in themselves cannot support a conclusion that the plant is polluting the LeTort stream. They argue that the actual quantity of BOD discharged into the stream by weight should govern such a determination rather than the percentage of BOD reduced from the sewage influent. Again, we cannot agree. The percentage reduction requirement was intended to ensure elimination of as much BOD from the influent as possible so as to minimize the amount of polluting effluent into the LeTort stream. The permit did, in fact, set an upper limit for the quantity of BOD which could be permissibly discharged into the stream, and it is true that this plant's effluent always fell within that limit. Clearly, however, that fact does

not counteract the fact of the inability of the plant to remove the required proportionate amounts of BOD present in the untreated sewage influent. We must conclude, therefore, that a finding of hydraulic overload accompanied by an insufficient percentage reduction of BOD is sufficient to justify a finding that a given sewage treatment facility causes pollution.[5]

Pollution having been established, a nuisance is present and it is clear that the DER may order a prohibition upon additional sewer connections as a remedy. The Clean Streams Law, 35 P.S. §691.203(b) (Supp. 1974-1975). It is equally clear that, prior to issuing such an order, consideration should be given by the DER to, *inter alia,* the immediate and long-range economic impact upon the Commonwealth and its citizens. The Clean Streams Law, 35 P.S. §691.5(a) (Supp. 1974-1975). The cross-appellants argue that the EHB should have lifted the sewer ban entirely because the DER failed to consider the economic impact of such a ban upon the citizens of Carlisle. The DER, on the other hand, argues that the sewer ban must be sustained in its entirety, because the EHB allegedly has no power to authorize additional pollution. Finally, the DER argues that the EHB's conclusion that limited additional sewer connections were not shown to produce more than a de minimis effect upon the LeTort stream during the plant's remaining life is legally irrelevant to their adjudication.

Treating these contentions in order, we observe that the EHB did find as fact that the DER failed to consider economic impact. This failure, however, was clearly remedied at the hearings during which testimony was

---

[5] The Clean Streams Law itself supports this conclusion. Section 5, 35 P.S. §691.202 (Supp. 1974-1975), states expressly that "[a] discharge of sewage without a permit or *contrary to the terms and conditions of a permit* or contrary to the rules and regulations of the board is hereby declared to be a nuisance." (Emphasis added.)

presented on this issue from at least one member of the Carlisle Borough Council, two local builders, one realtor, and a sales manager from a local vacation resort. Their testimony, expressing great concern over the possible adverse effects of a residential building and construction halt, clearly persuaded the EHB to modify the DER order. Thus, economic impact was considered prior to the final adjudication and, therefore, the adjudication meets the requirements of The Clean Streams Law.

Next, we must reject the DER's contention that the modified order unlawfully authorizes additional pollution. Aside from economic impact the statute suggests other factors to consider before the issuance of an environmental order. Among these are the water quality management and pollution control in the watershed as a whole, and the present and possible future uses of particular waters. Implicit in such considerations is the notion that a stream cannot and need not always be made pollution free immediately. Factors here, such as the planned operation of a new plant within three years, the current deteriorated condition of the subject stream and the probability that even a non-polluting plant could not restore the stream to an unpolluted state within that time period, were all relevant considerations in determining the appropriateness of the instant EHB order. With these considerations in mind, the EHB did not abuse its discretion by extending the length of time during which the cross-appellants would be made to comply with water quality requirements. We cannot characterize this action as an unlawful authorization of additional pollution.

We conclude, therefore, that the adjudication by the EHB modifying the DER order was constitutionally valid, was supported by substantial evidence and was not an abuse of the EHB's discretion. We issue, therefore, the following

ORDER

Now, this 27th day of December, 1974, the appeal by the Department of Environmental Resources and cross-appeals by the Borough of Carlisle and Carlisle Borough Sewer System Authority are hereby dismissed and the order of the Environmental Hearing Board is affirmed in accordance with this opinion.