514 A.2d 677

Mathies Coal Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued June 9, 1986, before President Judge CRUMLISH, JR., Judge BARRY, and Senior Judge ROGERS, sitting as a panel of three.

*Chester R. Babst, III,* with him, *Joseph M. Karas* and *Joseph R. Brendel, Thorp, Reed & Armstrong,* for petitioner.

*Zelda Curtiss,* Assistant Counsel, for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., September 4, 1986:

Mathies Coal Company appeals an Environmental Hearing Board (EHB) order upholding limitations by the Department of Environmental Resources (DER) on the amount of iron, manganese and aluminum in the discharge from Mathies' treatment plant. These limitations were imposed in an amended National Pollutant Discharge Elimination System (NPDES) permit which allowed an increased discharge from the plant. We affirm in part, reverse in part and remand.

Our scope of review of an EHB decision is limited to a determination of whether an error of law has been committed, constitutional rights have been violated or any findings of fact are unsupported by substantial evidence. *Einsig v. Pennsylvania Mines Corp.,* 69 Pa. Commonwealth Ct. 351, 452 A.2d 558 (1982).

Mathies contends that EHB incorrectly ruled that DER had no duty or discretion to consider evidence of economic or aquatic impacts when issuing the NPDES permit. We agree.

In support of its ruling, EHB stated that (1) DER was required to apply the specific water quality standards in 25 Pa. Code §93.7, (2) DER calculated the effluent limitations from a formula (mass balance equation)[1] considering these standards as well as the actual or estimated lowest seven-consecutive-day average receiving stream flow occurring once in ten years (Q7-10)[2] and (3) the issue of the Q7-10 value was removed from contention by a stipulation of the parties.

---

[1] DER asserts that it uses the following mass balance equation to determine the concentration of a pollutant which may be discharged without contravening the water quality standards in 25 Pa. Code §93.7:

[Q7-10 x concentration of pollutant already in receiving stream]
+
[proposed volume of discharge x unknown concentration of pollutant]
=
(25 Pa. Code §93.7 standards) (total flow)

[2] 25 Pa. Code §93.5(b), which defines the Q7-10 (otherwise known as design stream flow), provides:

(b) *Application of design stream flow.* The accepted design stream flow, to which the water quality criteria as set forth in this chapter shall apply, is the actual or estimated lowest 7-consecutive-day average flow that occurs once in 10 years for a stream with unregulated flow, or the estimated minimum flow for a stream with regulated flows, except where the Department determines that a more restrictive application is necessary to protect a particular designated or existing use. Where the lowest 7-consecutive-day average flow that occurs once in 10 years is zero, the Department shall specify the design flow based on the identified or estimated flow at that point where a use identified in §93.4 (relating to Statewide water uses) becomes possible.

However, DER's regulations provide that the water quality standards for a receiving stream are only "one of the major factors" in developing discharge limits. 25 Pa. Code §93.5(a).[3] Therefore, DER generally has discretion to consider other factors when enforcing these standards by limiting discharge from a particular source. *See Lucas v. Department of Environmental Resources,* 53 Pa. Commonwealth Ct. 598, 420 A.2d 1 (1980) (25 Pa. Code §93.5(a) allows discharge limitations to be established on an individual case-by-case basis).

Moreover, because such discretion exists, DER must consider, where applicable, the economic and aquatic impacts of its actions pursuant to Section 5(a) of The Clean Streams Law.[4] This Court has so interpreted

---

[3] This section provides:

(a) *Application of effluent limitations.* The water quality criteria prescribed in this chapter for the various designated uses of the waters of this Commonwealth apply to receiving waters and are not to be necessarily deemed to constitute the effluent limit for a particular discharge, but rather one of the major factors to be considered in developing specific limitations on the discharge of pollutants. Where water quality criteria become the controlling factor in developing specific effluent limitations, the procedures set forth in §95.3 (relating to waste load allocations) will be employed.

[4] Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.5(a). This section provides, in pertinent part:

(a) The department, in adopting rules and regulations, in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act, consider, where applicable, the following:

(1) Water quality management and pollution control in the watershed as a whole;

(2) The present and possible future uses of particular waters;

. . . .

Section 5(a). *See Department of Environmental Resources v. Borough of Carlisle,* 16 Pa. Commonwealth Ct. 341, 330 A.2d 293 (1974).[5]

DER contends that Mathies has waived its right to challenge the use of the mass balance equation to calculate the effluent limitations because it did not specifically do so below. However, by contesting DER's failure to consider the economic and aquatic effects of limiting the discharge, Mathies certainly contested DER's use of the formula to effect the limitations.

The *weight* to be given each factor considered when issuing a permit must be determined by DER based on the circumstances.[6] However, DER may not use the mass balance equation to avoid affording the required individualized consideration to permit applicants. Therefore, we affirm the EHB order in part,[7] but reverse the order insofar as it determines that DER was not required to consider evidence of economic and aquatic impacts when issuing the NPDES permit and remand this case for such consideration.

---

(4) The state of scientific and technological knowledge;
(5) The immediate and long-range economic impact upon the Commonwealth and its citizens.
(Footnote omitted.)
We recognize that DER may not consider economic or aquatic impacts when enforcing a mandatory regulation which permits no discretion. *East Pennsboro Township Authority v. Department of Environmental Resources,* 18 Pa. Commonwealth Ct. 58, 334 A.2d 798 (1975). However, as we explained, this is not presently the case.

[5] Although the *Carlisle* Court held that economic and aquatic effects must be considered by DER when issuing *orders,* it is clear under Section 5(a) that such consideration is required when "issuing orders or *permits."* (Emphasis added.) *See Concerned Citizens for Orderly Progress v. Department of Environmental Resources,* 36 Pa. Commonwealth Ct. 192, 387 A.2d 989 (1978).

[6] Such weight may change where the discharge to be regulated would be the only discharge into the receiving waters.

[7] The EHB decision contested herein affirmed two earlier EHB determinations. In one of these, dated January 14, 1985,

ORDER

The Environmental Hearing Board order, No. 82-212-G dated June 10, 1985, is affirmed in part, reversed in part and this case is remanded for proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

---

EHB ruled that, even if the Q7-10 is zero at the discharge point, it is that point which must be monitored to *ascertain compliance* with effluent limitations after they are set (to *set the limitations*, the value of the Q7-10 must be calculated at a point downstream where a statewide use becomes possible if the Q7-10 is zero at the discharge point). Thereafter, the parties stipulated:

> In view of the Board's ruling that the discharge monitoring point does not move downstream, even if the Q(7-10) at the discharge point is zero, there is no further point to contesting before the board the actual Q(7-10) at the point of discharge. Even assuming the design flow for Mathies' NPDES permit were calculated at a point of first use downstream from the actual discharge point, the iron and manganese effluent limitations in Mathies' NPDES permit either would not change or would result in only an insignificant relaxation.

We hold that EHB correctly concluded that (1) the stipulation removed from contention the issue of the Q7-10 value to be used in calculating the effluent limitations and (2) the proper compliance monitoring point is the discharge point.