559 A.2d 506

**MATHIES COAL COMPANY, Appellee,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Appellant.**

Supreme Court of Pennsylvania.

Argued March 7, 1989.

Decided May 30, 1989.

8

Zelda Curtiss, Asst. Counsel, Barbara H. Brandon, Director, Western Region Office of Chief Counsel, Dept. of Environmental Resources, Pittsburgh, for appellant.

Chester R. Babst, III, Joseph M. Karas, Babst, Calland, Clements & Zomnir, P.C., Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

■ The Commonwealth of Pennsylvania, Department of Environmental Resources (DER) appeals the decision of the Commonwealth Court which reversed in part and affirmed in part an Order of the Environmental Hearing Board (Board) dismissing the appellee, Mathies Coal Company's (Mathies) challenge of certain effluent limitations imposed by the DER in Mathies' National Pollutant Discharge Elimination System (NPDES) permit. In dismissing Mathies' challenge, the Board held that the DER was not required to consider the economic consequences upon Mathies or the aquatic impact of the mine discharge in setting the effluent limits[1] established in the permit. Upon review of the Board's adjudication, the Commonwealth Court reversed that portion of the Board's order. To the contrary, the Commonwealth Court held that the DER was indeed required to consider the economic impact on Mathies and the aquatic effects of its actions in setting the effluent limitations in Mathies' NPDES permit. We find that the Commonwealth Court erred in finding such a requirement and now reverse.

On August 4, 1982, responding to Mathies' request, DER issued Amendment No. 3 to Mathies' NPDES permit PA 0023337. The amendment authorized Mathies to increase its discharge into Peters Creek, Washington County, from the Thomas Portal of its coal mine, to 4,000 gallons per minute (gpm) from a previous maximum of 420 gpm. Additionally, the amendment imposed water quality based effluent limitations on various discharge parameters including, *inter alia,* the concentrations of iron, manganese and aluminum.

On September 9, 1982, Mathies appealed to the Board challenging, *inter alia,* the more restrictive effluent limita-

---

**1.** *Effluent limits* is defined as: "Any restriction established by the Department on quantities, rates, and concentrations of pollutants which are discharged into the waters of this Commonwealth." 25 Pa.Code § 93.1.

tions established by the DER for iron, manganese and aluminum. In its Adjudication and Order issued on June 10, 1985, the Board, *inter alia*, made the following Findings of Fact:

"10. DER computed the effluent limitations on iron, manganese and aluminum concentrations from a formula based on the amount of flow in the Thomas Portal discharge and the so-called Q(7–10) flow in Peters Creek; the formula seeks to ensure that the final effluent concentrations in Peters Creek, after dilution of the discharge in Peters Creek, do not exceed the effluent concentrations prescribed by 25 Pa.Code Chapter 93...."

"12. Mathies challenged neither the intent nor the substance of DER's formula...."

The issue of the economic impact on Mathies in complying with the effluent limits was the primary thrust of Mathies' argument in the proceedings below. The Board, in considering Mathies' argument concluded:

"DER is required to apply the standards set forth in 25 Pa.Code § 93.7; therefore, it was not required to take into account the economic consequences upon [Mathies] of its action in setting the effluent limitations contained in the permit. The effluent limitations are calculated from a formula which takes into consideration the standards set forth in § 93.7 as well as the Q7–10 of the receiving stream. The Q7–10 is defined at 25 Pa.Code § 93.5(b) as the lowest-seven-consecutive-day average flow that occurs once in ten years. The monitoring point for determining compliance with the effluent limitations is the point of discharge to the receiving stream. Given this determination, the parties stipulated that there was no point in contesting the Q7–10 value at the point of discharge. The parties agreed that even if the Q7–10 were figured for a point downstream from the discharge, the calculation of the effluent limitations would not be significantly altered. Therefore, since the issue of the Q7–10 value to be used in calculating the effluent limitations has

been removed from contention, and since DER was required to apply the standards set forth in 25 Pa.Code 93.7 in calculating those limitations, it follows that the limitations must be upheld".[2]

Secondarily, Mathies raised the acquatic impact issue, which the Board disposed of as follows:

"The possible effects, or lack of effects, of the discharge on plant and animal life in Peters Creek is outside the

**2. § 93.7. Specific water quality criteria.**

(a) Waters of this Commonwealth for which specific criteria have been established are listed in § 93.9 * (relating to designated water uses and water quality criteria.)

(b) References to specific criteria in § 93.9 shall be keyed to the list of specific criteria set forth in subsection (c) and to the groups of criteria set forth in subsection (d).

(c) The following Table 3 shall display the specific water quality criteria. Unless otherwise specified, the specific criteria concentration limits are for the total, rather than the dissolved, form of a substance.

    *   *   *   *   *   *

(d) Unless otherwise specified in subsection (e), § 93.5(d) and (e) (relating to the application of water quality criteria to discharge of pollutants), and § 93.9, Statewide specific criteria set forth in the following Table 4 shall apply to all surface waters of this Commonwealth:

    *   *   *   *   *   *

(e) The following Table 5 contains groups of specific water quality criteria based upon water uses to be protected. When the symbols listed below appear in the *Water Uses Protected* column in § 93.9 (relating to designated water uses and water quality criteria), they have the meaning listed in the table below. Exceptions to these standardized groupings will be indicated on a stream-by-stream or segment-by-segment basis by the words "Add" or "Delete" followed by the appropriate symbols described elsewhere in this chapter.

    *   *   *   *   *   *

(f) The list of specific water quality criteria does not include all possible substances that could cause pollution. For substances not listed, the general criterion that these substances shall not be inimical or injurious to the designated water uses applies. The best scientific information available will be used to adjudge the suitability of a given waste discharge where these substances are involved.

* **§ 93.9. Designated water uses and water quality criteria.**

Except as provided in § 93.5(d) and (e) (relating to the application of water quality criteria to discharge of pollutants), the following tables display designated water uses and water quality criteria. The county column in Drainage Lists A through Z indicates the county in which the mouth of the stream is located.

(Drainage Lists A through Z follow)

scope of [Mathies'] appeal, except as such facts bear on the point at which the flow is to be estimated in accordance with 25 Pa.Code § 93.5(b).[3]

3. The issue of the aquatic impact of the effluent limits was a secondary argument advanced in a sketchy fashion in the proceedings below. Even in this court, the arguments and briefs focus upon the economic impact issue and more or less skim over the question of the aquatic impact of the effluent limits. We believe the reason for this sketchy treatment of the aquatic impact factor is that the issue lacks merit. Basically, Mathies asserts that the DER should be required to consider evidence and determine what specific effect the particular discharge from Mathies' mine would have on the biota of Peters Creek in issuing the amendment to Mathies' NPDES permit. That determination however, was made by the DER in establishing the effluent limits. The DER points out that Mathies is the sole discharger into the head waters of Peters Creek. The DER further points out that two of the pollutants involved here, namely, iron and manganese are considered "conservative." This means that they do not "decay with time or disappear from the stream by settling, absorption or other means." (Brief of Appellant, p. 15, n. 27.)

To determine the applicable effluent limitations in light of these facts, the DER developed and used a mass balance equation.

"A mass balance [equation] is very simply an expression of the basic law of conservation of matter. It is an exact accounting of all the materials that enter, accumulate, or are depleted in a given time interval. The principle of material balance calculation is to establish a number of independent equations equal to the number of unknowns of composition and mass." (citation omitted)

The mass balance equation relied upon in this case is a one dimensional model for a pollutant that does not decay, commonly referred to as a conservative or persistent pollutant. (citation omitted) The components of the mass balance equation are: background stream flow; background stream concentration of a parameter; design average flow of the discharge and the applicable pollutant criteria. The actual formula is: [Q 7–10 × background stream concentration] + [Design average flow × Unknown concentration] = [Chapter 93 criteria] (Total Flow). The appellant DER indicates that: "In this case the equation's solution was obvious because the volume of the discharge is so large when compared to the design flow of the receiving stream (8.87 cfs to 0.056 cfs). Indeed when Mathies' discharge combines with the receiving stream (8.87 cfs + 0.056 cfs = 8.926) its discharge of 8.87 cfs accounts for over 99% of the total stream flow. Under these circumstances, the water quality criteria became the controlling factor in the equation ... (footnote omitted), and as a result, the criteria for iron and manganese represents the highest concentration of these metals that could be present in the Mathies' discharge. This is because any higher values would not protect all the aquatic and water supply uses of Peters Creek." (Appellant's brief, p. 16.) Thus, the aquatic effects were indeed considered in the manner mandated by the water quality regulations, 25 Pa.Code § 93.5(b). No further individualized consideration, as argued for by Mathies, need be given.

■ On appeal, the Commonwealth Court, in describing its reviewing powers, correctly observed:

"Our scope of review of [a Board] decision is limited to a determination of whether an error of law has been committed, constitutional rights have been violated or any findings of fact are unsupported by substantial evidence."

*Mathies Coal Company v. DER*, 100 Pa.Cmwlth.Ct. 311, 312, 514 A.2d 677, 678 (1986). The Commonwealth Court went on to hold:

"[D]ER's regulations provide that the water quality standards for a receiving stream are only 'one of the major factors' in developing discharge limits. 25 Pa.Code § 93.5(a). Therefore, DER generally has discretion to consider other factors when enforcing these standards by limiting discharge from a particular source. *See Lucas v. Department of Environmental Resources*, 53 Pa. Commonwealth Ct. 598, 420 A.2d 1 (1980) (25 Pa.Code § 93.5(a) allows discharge limitations to be established on an individual case-by-case basis)." (Footnote omitted.)

*Id.* at 314, 514 A.2d at 678. Citing its opinion in *Department of Environmental Resources v. Borough of Carlisle*, 16 Pa.Cmwlth. 341, 330 A.2d 293 (1974), the Commonwealth Court further concluded:

"[Because such discretion exists, DER must consider, where applicable, the economic and aquatic impacts of its actions pursuant to Section 5(a) of The Clean Streams Law." (Footnote omitted.)

*Mathies Coal Company v. DER*, 100 Pa.Cmwlth.Ct. at 314, 514 A.2d at 678, 679. Thus, the Commonwealth Court reversed the Board's order insofar as the Board had held that the DER was not required to consider evidence of economic and aquatic impacts when issuing the NPDES permit. The Court then remanded the case for further proceedings to consider these issues.

The appellant, DER, argues that neither the Pennsylvania Water Quality Regulations (25 Pa.Code, Chapter 93) nor

The Clean Streams Law (35 P.S. § 691.1, et seq.) imposes upon DER the obligation to engage in an ad hoc economic inquiry each time it sets effluent limits in issuing a NPDES permit or an amendment to a permit. DER argues, particularly, that the Commonwealth Court misconstrued the phrase contained in 25 Pa.Code § 93.5(a)—*"one of the major factors to be considered"*—as requiring the DER to consider Mathies' cost of compliance when setting water quality based effluent limitations in a permit.[4] The provisions of 25 Pa.Code § 93.5(a) state:

93.5  **Application of water quality criteria to discharge of pollutants.**

(a) *Application of effluent limitations.* The water quality criteria prescribed in this chapter for the various designated uses of the waters of this Commonwealth apply to receiving waters and are not to be necessarily deemed to constitute the effluent limit for a particular discharge, but rather *one of the major factors to be considered* in developing specific limitations on the discharge of pollutants. Where water quality criteria become the controlling factor in developing specific effluent limitations, the procedure set forth in § 95.3 (relating to waste load allocations) will be employed. (Emphasis supplied.)

From the language, *"one of the major factors to be considered"*, set forth in § 93.5(a), the Commonwealth Court determined that DER had the discretion to consider factors other than the statutory criteria when enforcing water quality standards in establishing effluent limitations on discharges. The Commonwealth Court reasoned that because of this discretion to consider other factors, the DER was *required* to consider the economic impact of the effluent limitations on Mathies.

The Board, on the other hand, in considering the discretion possessed by the DER in setting effluent limits, held:

4. Brief of Appellant, DER, p. 20.

"[I]t was not an abuse of discretion for DER to have established the aforesaid effluent limits without considering the economic impact on Mathies. Indeed, under the circumstances just described, wherein Mathies has offered no possibly meritorious legal defenses to application of the regulations, it probably would have been an abuse of discretion for DER not to apply them.[5]

The DER, in exercising its discretion in enforcing Pennsylvania's water quality regulations, determined that it was not appropriate, under the circumstances of this case and in light of the applicable regulations and statute, to consider the economic impact on the discharger Mathies area in establishing effluent limitations in conjunction with the amendment to Mathies' NPDES permit. The Board held that DER's actions in this regard were lawful and proper.

The Commonwealth Court, in reversing that portion of the Board's Order, held that the DER was *obliged* to consider the economic consequences to Mathies in setting the effluent limitations associated with Mathies' NPDES permit. In effect, the Commonwealth Court held that because the DER has discretion to consider various factors in establishing water quality, it has no discretion when it comes to consideration of the economic impact of the effluent limitations it sets. According to the Commonwealth Court, this factor *must* be considered. Under the Commonwealth Court's decision, the DER's discretion to consider factors other than the statutory criteria is translated into an obligation to consider the economic impact to the discharger in establishing effluent limitations. We cannot agree. Discretion involves the ability to exercise judgment and choose between or among different courses of action, not an obligation to pursue a particular course of action.

The Water Quality Regulations at 25 Pa.Code, Chapter 93 make provision for a downgrading of a stream use where certain conditions are shown to exist. 25 Pa.Code § 93.4(b) provides:

5. Adjudication of the Environmental Hearing Board (EHB), p. 9.

(b) Less restrictive uses than those currently designated for particular waters listed in § 93.9 (relating to designated water uses and water quality criteria) may be adopted where it is demonstrated that:

(1) The existing designated use is not attainable because of natural background conditions;

(2) The existing designated use is not attainable because of irretrievable man-induced conditions; or

(3) Applications of effluent limitations for existing sources more stringent than those required under 33 U.S.C. § 1311, in order to attain the existing designated use, would result in substantial and widespread adverse economic and social impact.

Mathies failed to pursue the demonstration of any of the conditions set forth in § 93.4(b) which would have permitted a downgrading of the stream use. Instead, Mathies challenged the effluent limits by arguing that the DER failed to meet its obligation and take into account the economic consequences to Mathies of compliance. The controlling regulations and statute impose no such obligation on the DER.

Additionally, as we noted above, the Commonwealth Court, in reaching its decision, relied upon the provisions of Section 5(a) of The Clean Streams Law, and its previous opinion in *Department of Environmental Resources v. Carlisle, supra.* Section 5(a) of The Clean Streams Law provides:

(a) The department, in adopting rules and regulations, in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act, consider, where applicable, the following:

(1) Water quality management and pollution control in the watershed as a whole;

(2) The present and possible future uses of particular waters;

(3) The feasibility of combined or joint treatment facilities;

(4) The state of scientific and technological knowledge;

(5) The immediate and long-range economic impact upon the Commonwealth and its citizens

35 P.S. § 691.5(a).

The Commonwealth Court's reliance upon the Clean Streams Law and its opinion in *Department of Environmental Resources v. Carlisle, supra* to support its holding in the instant case is misplaced. The economic impact which must be considered under The Clean Streams Law and under *Carlisle* relates to the impact on the community and public at large, not on the individual discharger. In *Carlisle*, the cross-appellants, Borough of Carlisle and the Carlisle Borough Sewer System Authority, in challenging a sewer ban order imposed in that case, argued that the DER failed to consider the economic impact *upon the citizens of Carlisle*. Citing Section 5(a) of The Clean Streams Law, the Commonwealth Court, in *Carlisle*, held that: "consideration should be given by the DER to, *inter alia,* the immediate and long-range *economic impact upon the Commonwealth and its citizens. (Emphasis supplied.) Id.,* 16 Pa.Cmwlth.Ct. at 350, 330 A.2d at 299. That court went on to find that such consideration was given at the hearing before the Board when testimony was presented on the economic impact issue by a Borough Council member, two local builders, one realtor and a sales manager for a local vacation resort. *Id.* Neither The Clean Streams Law nor *Carlisle* require consideration of the economic impact on an individual discharger.

The issue presently before us in this case is specific and narrow: Is the DER required, *as a matter of law,* to consider the *economic consequences to the discharger* in establishing effluent limitations for discharges in issuing or amending a NPDES permit?

In reviewing the Adjudication of the Board, we find no error of law, no violation of constitutional rights, and substantial evidence in support of the Board's findings of fact.

" 'By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. . . . That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion.' *Blumschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 572, 573, 109 A.2d 331, 334 (1954)."

*In re Petition of Acchione*, 425 Pa. 23, 30, 227 A.2d 816, 820 (1967). The DER's interpretation of its regulations and regulatory scheme is entitled to deference by this court and should not be disregarded unless shown to be clearly erroneous. *See Jackson v. Pennsylvania Public Utility Commission*, 105 Pa.Cmwlth. 37, 522 A.2d 1187 (1987).

The DER insists that the Commonwealth Court has misread the water quality regulations embodied in 25 Pa.Code § 93.5(a). The DER argues that the *"one of the major factors to be considered"* language contained in § 93.5(a), "is not an authorization to the [DER] to engage in a cost/benefit analysis when calculating water quality based effluent limitations. Instead, the phrase in question refers to the numerous scientific and technical decisions which the [DER] makes in deriving a water quality based limit." (Brief of Appellant, pp. 27 & 28) The appellant DER further argues that:

"[I]t has interpreted this less than crystalline phrase as authorizing a stream specific inquiry where the following

questions are answered: (1) What is the stream classification; (2) What pollutants are discharged; (3) What is the fate and transport of the pollutants (do they decay or persist, do they chemically or synergistically react with other substances); (4) What other point and non-point sources discharge to this stream segment; (5) Is the discharge to a free flowing stream or to a lake or impoundment; (6) What is the concentration of the pollutant already in the stream; (7) What is the receiving stream volume and (8) What is the volume of the discharge. *See* 25 Pa.Code § 95.3"

(Brief of Appellant DER pp. 28 & 29). The DER asserts: "this analysis does involve many factors that are scientifically and technically complex, however, it does not involve any economic balancing." (Brief of Appellant DER, p. 29). This interpretation of the water quality regulations by DER is reasonable and is consistent with the purposes of the regulations and the relevant statutes.

25 Pa.Code, Chapter 93 establishes water quality standards for the waters of Pennsylvania. The standards are based upon water uses which are to be protected. 25 Pa.Code § 93.2. The purpose of The Clean Streams Law, 35 P.S. § 691.1, et seq., is to prevent the discharge of pollution into the waters of the Commonwealth. *See Commonwealth v. Barnes & Tucker*, 472 Pa. 115, 371 A.2d 461, appeal dismissed 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977). The Commonwealth Court, in reversing in part the order of the Board, failed to give adequate recognition to the scope and purpose of the water quality standards and The Clean Streams Law, and substituted it judgment for that of the DER.

Accordingly, the order of the Commonwealth Court is reversed insofar as it reverses the order of the Environmental Hearing Board.