642 A.2d 568

**VESTA MINING COMPANY, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 1, 1994.

Decided May 18, 1994.

146

Stanley R. Geary, for appellant.

Theresa Grencik, Asst. Counsel, for respondent.

Before CRAIG, President Judge, and KELLEY, J., RODGERS, Senior Judge.

RODGERS, Senior Judge.

Vesta Mining Company (Vesta) appeals an Environmental Hearing Board (EHB) order which dismissed Vesta's appeal challenging the effluent limitations imposed by the Department of Environmental Resources (DER) in a revised permit for two gravity discharges of a Vesta coal mine.

In 1986, DER issued a Coal Mining Activity Permit (CMAP) to Vesta authorizing it to discharge mine drainage into a stream known as Fishpot Run in Washington County, Pennsylvania. The authorized discharges were identified in the CMAP as Outfalls 002 and 007.[1]

In 1987, the wastewater from Outfall 007 began to deteriorate in quality and it became necessary to treat the drainage in order to meet the effluent limitations of the 1986

1. This appeal only concerns Outfall 007.

CMAP.[2]  Vesta then submitted an application to DER for a revision of the 1986 CMAP to authorize and reflect the construction of a wastewater treatment facility.  DER approved the revision on January 28, 1988, and this revised CMAP included identical effluent limitations to those contained in the 1986 CMAP.[3]  Vesta appealed the 1988 revised permit to the EHB alleging that several errors committed by DER resulted in improper and overly stringent effluent limitations.[4]  The EHB dismissed Vesta's appeal finding that Vesta had failed to meet its burden of proof in demonstrating that DER had erred in its effluent limitation calculations, and Vesta had not shown that it had submitted any new information which would have necessitated that DER recalculate the effluent limits for Outfall 007 when it approved the 1988 revised CMAP.  Vesta now appeals to this Court.[5]

■  Vesta contends that in dismissing its appeal, the EHB committed various errors of law and that the EHB's findings of fact, indicating that DER had not improperly calculated the Vesta effluent limitations at issue, were not supported by substantial evidence.  Pursuant to 25 Pa.Code § 95.1(a), DER is required to impose the more stringent of technology based

2.  Effluent limits are defined as: "Restrictions established by the Department on quantities, rates and concentrations of pollutants which are discharged into the waters of this Commonwealth."  25 Pa.Code § 93.1.

3.  When DER approved Vesta's 1988 revised CMAP, it did not recalculate effluent limitations.

4.  In its application for a revision to the 1986 CMAP, Vesta did not request that DER recalculate the effluent limits for Outfall 007, nor did it include any information indicating changes in the nature of the discharge or stream flow other than the quality of the discharge.  Vesta's appeal is really a challenge to DER's calculations used in creating the effluent limitations included in the 1986 permit, and believes that DER had a duty to re-calculate those limitations when issuing the 1988 CMAP revision.

5.  This Court's scope of review of an EHB decision is limited to a determination of whether an error of law has been committed, constitutional rights have been violated or whether any findings of fact are unsupported by substantial evidence.  *Mathies Coal Company v. Department of Environmental Resources*, 522 Pa. 7, 559 A.2d 506 (1989).

effluent limitations or water quality based effluent limitations.[6] Vesta argues that because DER mis-calculated the Q7–10 flow of Fishpot Run,[7] improper water quality based effluent limitations were utilized instead of the less stringent technology based limitations.

In regulations promulgated under the Clean Streams Law,[8] Fishpot Run has a specifically designated use as "Warm Water Fishes". 25 Pa.Code §§ 93.4, 93.9v. The point at which water quality is to be achieved to support this use is determined by 25 Pa.Code § 93.5. Much of this case revolves around conflicting interpretations of 25 Pa.Code § 93.5(b), which reads as follows:

(1) Except if otherwise specified in this chapter, the water quality criteria in this chapter shall be achieved at stream flows equal to or exceeding Q7–10. For streams where the Q7–10 flow is estimated to be zero, water quality criteria shall be achieved at the first downstream point where the stream is capable of supporting designated water uses, as defined in § 93.4 (relating to Statewide water uses).

Vesta argues that because DER improperly calculated the Q7–10 of Fishpot Run as .025 cubic feet per second, water quality was determined at the point where Vesta discharged wastewater into the stream causing water quality based effluent limitations to be controlling. If the actual Q7–10 flow of the stream was zero, as Vesta asserts, then the point of first designated use at which water quality criteria shall be achieved through application of 25 Pa.Code § 93.5(b) would be downstream at the confluence of Fishpot Run and the Monon-

---

**6.** Technology based limitations are based upon the best available technology. Water quality based effluent limitations are effluent limitations based on the need to attain or maintain specific water quality criteria in order to assure protection of a designated use. 25 Pa.Code § 93.1. Water quality based effluent limitations are calculated using a mass balancing equation. *See, Mathies Coal Company.*

**7.** The Q7–10 is defined at 25 Pa.Code § 93.1 as the lowest seven consecutive day average flow that occurs once in ten years.

**8.** Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1– 691.1001.

gahela River.[9] When the Monongahela River is used to establish water quality criteria, then the less stringent technology based effluent limitations would apply to Vesta's 002 and 007 Outfall discharges.

First, Vesta attacks the methodology employed by DER when calculating the Q7–10 flow of Fishpot Run. Vesta asserts that DER utilized the wrong comparison stream when calculating the Q7–10 flow of Fishpot Run. Vesta's consultant, Larry Simmons, compared data from the alternate stream actually used in Fishpot Run's Q7–10 calculations with information from a stream he stated should have been used to arrive at a more accurate estimate of Fishpot Run's Q7–10 stream flow. This evidence, Vesta argues, proves that substantial evidence does not support the EHB's finding of fact that DER did not err in its calculations of the Q7–10 flow of Fishpot Run. The only related EHB finding of fact concerning these calculations reads as follows:

32. Vesta did not submit any information to the Department which indicated an error in the Department's calculation of the Q7–10 flow or which provided a basis for reconsideration of the effluent levels of the 1986 permit.

Vesta also points to the "Discussion" section of the EHB adjudication where the EHB concluded that "the testimony of Vesta's witnesses does not indicate an error in the method of determining the Q7–10 of the stream but merely that there could have been a different way to arrive at the Q7–10 of Fishpot Run." (EHB adjudication at 12).

In addition, Vesta asserts that the EHB's own subsequent findings that Fishpot Run was dry on several occasions for substantial periods of time in 1991 and 1992, supports this contention of error on the part of DER. These EHB findings state that:

9. This conclusion by Vesta was rejected by the EHB and is one of the issues to be addressed later in this opinion. The EHB interpreted 25 Pa.Code § 93.5(b) to mean that even if the Q7–10 flow for fishpot run was zero, because the discharge rate of the outfalls overwhelms the Q7–10 flow, and because life classified as a protected designated use of the stream was sustained at the point of discharge, water quality must be measured and maintained at that location and not downstream.

24. Fishpot Run has been dry on several occasions upstream of outfall 002. In 1992, it was dry for a period of four to five months.

25. In July, August and September of 1991, the sole component of flow in Fishpot Run was the discharge from outfalls 002 and 007, based upon monitoring of the stream above and below the two outfalls.

■ These claims of EHB error fail on several grounds. First, in concluding that Vesta's expert only succeeded in showing an alternate methodology by which to calculate the Q7–10 of Fishpot Run, the EHB was relying on the testimony of Raymond Lattner, DER's expert witness. Mr. Lattner testified in detail about the method by which DER has established and the method he had used when calculating the Q7–10 of Fishpot Run. (R.R. 203a–245a). It is not for this Court to invade into the credibility determinations of competing experts, the weight of whose testimony is properly left to the EHB to determine. *T.R.A.S.H., Ltd. v. Department of Environmental Resources,* 132 Pa.Commonwealth Ct. 652, 574 A.2d 721 (1990), *petition for allowance of appeal denied,* 527 Pa. 659, 593 A.2d 429 (1990).

■ Secondly, the fact that years after the Q7–10 flow of Fishpot Run was determined, a drought caused the stream to dry up, has little or no bearing on whether those initial calculations were flawed. Therefore, EHB findings of fact numbers 24 and 25 should not be taken as evidence of error on behalf of DER, especially considering that, as finding of fact number 32 states, DER was not informed of any flow changes when Vesta submitted its 1988 revision request.

In any event, the arguments presented by Vesta above are extraneous in light of the EHB's ultimate holding that regardless of the Q7–10 flow of Fishpot Run, water quality must be maintained at the point of discharge because the stream's designated use exists at the point of discharge and that that designated use must be protected.[10] It is this holding, the

10. The EHB made the following relevant findings of fact on this issue:

EHB's and DER's interpretation of 25 Pa.Code § 93.5(b)(1), which Vesta next argues is an error of law.

Vesta argues that DER was obligated under 25 Pa.Code § 93.5(b)(1) to perform a biological assessment of Fishpot Run before calculating its effluent discharge limits. This argument rest upon the assumption that the Q7–10 of Fishpot Run was zero at the time the initial effluent discharges were set. Even if life properly classified as a designated use of the stream under 25 Pa.Code §§ 93.4, and 93.9v was found at the point of discharge, Vesta argues that under Q7–10 zero conditions, DER must proceed downstream to the point where the stream is first capable, without the support of discharges, to support the designated protected use.

The EHB rejected this interpretation of 25 Pa.Code § 93.5(b)(1). DER had asserted that when a stream possesses a designated use under 25 Pa.Code § 93.9, and there is no data to suggest that the stream does not support that use, DER is under no obligation to conduct a biological study before establishing effluent limitations designed to meet water quality for the entire length of the stream. However, when there is some indication that the stream may not support its designated use, then a biological study is commenced to determine which sections of the stream are capable of supporting that use and demand further protection.[11] Because DER's initial Q7–10 calculation yielded a Q7–10 flow greater than zero, it had no need to utilize the services of an aquatic biologist to determine the point of first designated use.

22. Even if a stream has a Q7–10 flow of zero, where there is a designated use at a discharge point, that use must be protected, and the effluent limitations are established at the point where this use first occurs.

23. The Department has in certain situations established effluent limitations so that the criteria of Chapter 93 would be met at the point of discharge. Most of these situations involved streams with a Q7–10 flow estimated to be zero or which are known to have periods of low or no flow.

11. A Q7–10 flow rate of zero would constitute such an indication that a stream may not be capable of supporting its designated use. (R.R. 241–242)

■ This analysis is interpreted by Vesta as creating an erroneous presumption that designated uses will exist throughout the entire length of the stream when the Q7–10 flow of that stream is zero. Our review of the EHB language reveals the contrary. The presumption of life existing throughout the stream such that water quality must be maintained exists only for Q7–10 flow rates greater than zero. Furthermore, this presumption only exists when the stream in question possesses a codified designated use. Nothing in the EHB determination indicates otherwise. When evidence was presented showing that subsequent to initial measurements, the Q7–10 flow of Fishpot Run in recent years increasingly approached zero, the EHB holding was premised on the actual findings of protected life at the point of Vesta's discharges.

Vesta maintains that substantial evidence does not indicate that life, classified as the protected designated use of Fishpot Run, exists at the point of discharge. Vesta also argues that what biological life was found, should not be considered a protected life, because it was only sustained by the Vesta's discharges and the beneficial effect of those discharges should not be considered for purposes of 25 Pa.Code 93.5(b)(1).

■ As mentioned previously, 25 Pa.Code § 93.9v identifies Fishpot Run as having a designated use of "Warm Water Fishes." Vesta asserts that there is no substantial evidence to link the life found in the stream with this designated use. The warm water fishes use is defined at 25 Pa.Code § 93.3 as the "[m]aintenance and propagation of fish species and additional flora and fauna which are indigenous to a warm water habitat." Vesta argues that the expert testimony of DER's aquatic biologist, Thomas Proch, was insufficient because he did not personally examine the stream, and his testimony that a "balanced aquatic community" exists, does not establish the existence of fishes and fauna indigenous to a warm water fishes habitat.

Proch relied on data submitted by witnesses, including a report by Vesta's own witness, to arrive at his conclusions that the stream's designated use exists at the point of Vesta's discharges. Proch identified the different life observed by

various witnesses and described how the various organisms constituted a balanced aquatic community. He also elaborated upon the predator/prey relationship of the minnows and benthic macroinvertibrates whose lives are of sufficient duration to insure their presence for a significant portion of the year. Vesta does not deny that several forms of life exist in the stream even at times of zero Q7–10 flow; rather, Vesta only argues that Proch had failed to formally link up the life found with that indigenous to a warm water fish habitat. We find that Proch's testimony does provide substantial evidence that the designated use of Fishpot Run exists at the point of discharge. Proch described the methodology employed by DER when determining whether designated uses exist in streams, and unequivocally indicated that pursuant to this analysis, a warm water fishes use existed at the point of Vesta's Outfall 007 discharge into Fishpot Run. (R.R. 344, 348, 357–358).

Similarly, we reject Vesta's claim that DER erred when including the beneficial impact of the outfall discharges in the determination of first use under 25 Pa.Code § 93.5(b)(1). Vesta argues that DER must proceed downstream to where the "stream", without the aid of the discharge, is first capable of supporting the designated use. Vesta stresses that the word "downstream" from this section of the Code requires DER to proceed downstream of the discharge, regardless of existing life, when the Q7–10 flow equals zero.

DER stated that this was not their practice nor their interpretation of this regulation and the EHB agreed.[12] Our review of the testimony and reading of the regulation does not indicate that DER's interpretation is plainly erroneous. Considering that the very definition of water quality based effluent limitations states that they are designed to "assure

---

12. Recognizing what Vesta's interpretation would mean for other streams occasionally subject to drought conditions, the EHB stated that:

> [t]he interpretation urged by Vesta could make Fishpot Run and any other similarly situated stream a drain for the mine without reference to any designated use or existing stream life. We do not believe this is the intention of the Clean Streams Law or of § 93.4.

protection of a designated use",[13] we can not view DER's interpretation of Section 93.5(b)(1) as clearly erroneous when the EHB's factfinding found life at the point of discharge, and DER's interpretation results in the protection of that life.[14] It is well settled that DER's interpretation of its own regulations is entitled to great weight and will not be disregarded unless clearly erroneous.[15] *Hatchard v. Department of Environmental Resources,* 149 Pa.Commonwealth Ct. 145, 612 A.2d 621 (1992); *petition for allowance of appeal denied,* 533 Pa. 647, 622 A.2d 1378 (1993); *T.R.A.S.H., Ltd.*

■ Finally, Vesta argues that the EHB committed an error of law when it held that DER was under no obligation to recalculate effluent limitations for Vesta's Outfall 007. Vesta presents 25 Pa.Code §§ 86.37(a)(4) and 92.13 of DER's regulations in support of this claim. DER states that these regulations are inapplicable to the facts of this case, and urges us to reject Vesta's interpretation of them because requiring them to recalculate effluent limitations for every permit revision which does not present new data critical to those calculations would prove incredibly burdensome both to DER and mining companies.

We agree with DER and believe that the regulations emphasized by Vesta deal either with information which must be

13. *See* footnote 5.

14. We also note that the effluent discharges from Vesta's outfalls are basically groundwater which has seeped into the mine and is later pumped out. Therefore, one can not use the argument that "but for the mine drainage there would be no life" because it is impossible to determine whether the groundwater would augment Fishpot Run if the mine did not exist or ceased operations.

15. In addition, similar circumstances to those existing here were discussed in *Mathies Coal Company,* where the mine discharge constituted over 99% of the stream flow. In that case, our Supreme Court accepted that DER had properly considered the aquatic effects of the discharge as mandated by 25 Pa.Code § 93.5(b) when the designated "water quality criteria became the controlling factor in the equation" because the discharge so dominated the stream flow. *Id.* at 12, n. 3, 559 A.2d at 509 n. 3. Here, water quality criteria will likewise be controlling on Vesta's discharges, not only because the discharges often dominate the stream flow, but also because life in the form of the protected designated use of Fishpot Run was found at the point of discharge.

set forth in a permit application, or concern permit renewals as opposed to the revision which was applied for here. We disagree with Vesta's argument that the same process required for permit reissuance under 25 Pa.Code § 92.13 should be utilized for permit revisions and fear that this requirement would force DER to perform extensive calculations of effluent limitations every time a minor permit revision is requested.[16]

Vesta repeatedly presents *Florence Mining Company v. Department of Environmental Resources*, 1991 EHB 1301, for the proposition that DER is required to reconsider effluent limits when new information is presented. We note that *Florence Mining Company* dealt with a permit renewal as opposed to a permit revision; but, more important, *Florence Mining Company* had new information in the nature of volume or quantity of the discharge. Quantity of discharge is a critical component of the mass balance equation which calculates the effluent limits of applied for outfall discharges.[17] Conversely, quality of a discharge, the only change included in Vesta's permit revision application, is the unknown for which the mass balance equation is solved. As DER points out, quality of a discharge then becomes irrelevant to the calculation of effluent limits because it is the result which the mine drainage must achieve either naturally or through treatment. We, therefore, hold that when the only new information presented in an application for a CMAP permit revision is a change in the quality of a discharge, DER is not required to recalculate the discharge's effluent limitations.

Accordingly, the order of the EHB is affirmed.

### ORDER

NOW, May 18, 1994, the order of the Environmental Hearing Board, in the above-captioned matter, is affirmed.

16. DER points out that Vesta's permit revision was applied for within a year after the 1986 effluent limitations were set.

17. The components of the mass balance equation are the background stream flow or Q7–10 flow; background stream concentration of the pollutant; design average flow of the discharge and the applicable instream criteria for the pollutant in question. *Mathies Coal Company*.